United States Court of Appeals

 FOR THE DISTRICT OF COLUMBIA CIRCUIT

 Argued January 26, 1998 Decided April 3, 1998 

 No. 96-1234

 Columbia Falls Aluminum Company, et al., 

 Petitioners

 v.

 Environmental Protection Agency and 

 Carol M. Browner, Administrator, 

 Respondents

 Reynolds Metals Company, et al., 

 Intervenors 

 Consolidated with

 Nos. 97-1044, 97-1558, 97-1724

 

 On Petitions for Review of Orders of the 

 Environmental Protection Agency

 ----------


 Lester Sotsky argued the cause for petitioners. With him 
on the briefs was Jonathan S. Martel. Andrew S. Ratzkin 
entered an appearance.

 Steven E. Silverman, Attorney, Environmental Protection 
Agency, argued the cause for respondents. With him on the 
brief were Lois J. Schiffer, Assistant Attorney General, U.S. 
Department of Justice, and Daniel R. Dertke, Attorney.

 Michael W. Steinberg argued the cause for intervenors 
Reynolds Metals Company, et al. With him on the brief were 
Joshua D. Sarnoff, Loren R. Dunn and David R. Case. 
Lowell F. Martin and Michael A. McCord entered appear-
ances.

 Before: Ginsburg, Henderson, and Randolph, Circuit 
Judges.

 Opinion for the Court filed by Circuit Judge Randolph.

 Randolph, Circuit Judge: These consolidated petitions, 
brought by small manufacturers of aluminum, challenge three 
rules of the Environmental Protection Agency, promulgated 
pursuant to s 3004 of the Resource Conservation and Recov-
ery Act of 1976 ("RCRA"), Pub. L. No. 94-580, 90 Stat. 2795. 
The rules establish a treatment standard for "spent potlin-
er"--a byproduct of primary aluminum reduction--and pro-
hibit its land disposal if it is untreated. Because EPA's test 
for determining compliance with its spent potliner treatment 
standard is arbitrary and capricious, we vacate and remand. 
In all other respects, we deny the petitions for review.

 I. BACKGROUND

A. Statute and Regulations

 Subtitle C of RCRA establishes a comprehensive regulato-
ry scheme governing the treatment, storage, and disposal of 
hazardous wastes. Wastes are considered hazardous if they 
possess one of four characteristics (ignitability, corrosivity, 
reactivity, and toxicity) or if EPA lists them as hazardous 
following a rulemaking. See 42 U.S.C. s 6921(a); 40 C.F.R. 
pt. 261. Once a waste is listed or identified as hazardous, 


every aspect of its existence is regulated under Subtitle C. 
See Chemical Waste Management, Inc. v. EPA, 976 F.2d 2, 8 
(D.C. Cir. 1992).

 In 1984 Congress adopted the Hazardous and Solid Waste 
Amendments ("Amendments"), Pub. L. No. 98-616, 98 Stat. 
3221, shifting "the focus of hazardous waste management 
away from land disposal to treatment alternatives." Ameri-
can Petroleum Inst. v. EPA, 906 F.2d 729, 733 (D.C. Cir. 
1990). The Amendments prohibit land disposal of hazardous 
wastes unless one of two conditions is satisfied: either the 
waste is treated to comply with standards promulgated under 
RCRA s 3004(m), or EPA determines that hazardous constit-
uents will not "migrate" from the disposal unit. RCRA 
s 3004(g)(5), 42 U.S.C. s 6924(g)(5). Section 3004(m) pro-
vides that EPA must specify "those levels or methods of 
treatment, if any, which substantially diminish the toxicity of 
the waste or substantially reduce the likelihood of migration 
of hazardous constituents from the waste so that short-term 
and long-term threats to human health and the environment 
are minimized." 42 U.S.C. s 6924(m)(1).1 If hazardous 
wastes are treated to the level or by the method specified 
under s 3004(m), they are not subject to the land disposal 
prohibitions. 42 U.S.C. s 6924(m)(2).

 The 1984 Amendments did not ban all land disposal out-
right. With the exception of two categories of hazardous 
wastes for which Congress imposed earlier restrictions,2 EPA 
had to implement the land disposal prohibition in three 
phases for all wastes identified or listed as hazardous as of 
the time of the 1984 Amendments. See generally Hazardous 

__________
 1 In its first rulemaking to implement the Amendments, EPA 
considered both risk-based and technology-based treatment stan-
dards. Ultimately, EPA selected standards based on the perfor-
mance of the best demonstrated available technology ("BDAT"). 
See Hazardous Waste Treatment Council v. EPA, 886 F.2d 355 
(D.C. Cir. 1989) (upholding BDAT as a reasonable interpretation of 
s 3004(m) but remanding for fuller explanation).

 2 These two categories are solvents and dioxins, see s 6924(e), 
and the so-called California List wastes, see s 6924(d).


Waste Treatment Council v. EPA, 886 F.2d 355, 357 & n.1 
(D.C. Cir. 1989). To guarantee promptness, a statutory 
"hard hammer" fell on May 8, 1990. 42 U.S.C. 
s 6924(g)(6)(C). Hazardous wastes for which EPA failed to 
issue regulations by that date were subject to an absolute ban 
on land disposal. For newly identified or listed hazardous 
wastes, the statute required EPA to promulgate prohibitions 
and treatment standards within six months of the date of 
listing or identification. RCRA s 3004(g)(4), 42 U.S.C. 
s 6924(g)(4). EPA may delay the effective date of the land 
disposal prohibition until the earliest date that "adequate 
alternative treatment, recovery, or disposal capacity which 
protects human health and the environment" is available, but 
in any event no longer than two years. RCRA s 3004(h)(2), 
42 U.S.C. s 6924(h)(2). This is known as a "national capacity 
variance." Applicants may request an extension of the 
effective date for up to one year, renewable once for no more 
than one additional year. RCRA s 3004(h)(3), 42 U.S.C. 
s 6924(h)(3).

B. Spent Potliner

 All aluminum in the United States is produced by dissolv-
ing alumina (aluminum oxide) in a molten cryolite bath and 
then introducing a direct electric current to reduce the alumi-
na to aluminum metal. The reduction takes place in electro-
lytic cells, called pots, consisting of a steel shell lined with 
brick with an inner lining of carbon. The carbon lining is up 
to 15 inches thick and serves as the cathode for the electroly-
sis process. During a service life of four to seven years, the 
carbon lining absorbs the cryolite solution and degrades. 
Once a liner cracks, the pot is emptied and cooled. The steel 
shell is stripped away, leaving a large solid block of carbon--a 
"spent potliner." 3 An estimated 100,000 to 125,000 metric 
tons are produced each year. See 62 Fed. Reg. 1991, 1993 
(1997).

 The listing of spent potliner--assigned hazardous waste 
code K088--has a tangled history. EPA originally listed 
K088 in 1980 because it contained high concentrations of 

__________
 3 A more detailed description is found in 56 Fed. Reg. 32,993, 
33,002 (1991).


cyanide. See 45 Fed. Reg. 47,832 (1980). Before the regula-
tions took effect, Congress enacted the Solid Waste Disposal 
Act of 1980, Pub. L. No. 96-482, 94 Stat. 2334, which included 
a provision named after its sponsor, Congressman Tom Bevill 
of Alabama. The Bevill Amendment excluded mining wastes 
from Subtitle C regulation until EPA had conducted a study 
of the "adverse effects" of such wastes. See RCRA 
s 8002(p), 42 U.S.C. s 6982(p). EPA interpreted the Bevill 
Amendment to include "solid wastes generated during the 
smelting and refining of ores and minerals" and suspended its 
listing of spent potliner. See 46 Fed. Reg. 4614, 4615 (1981). 
When litigation ensued, EPA announced a proposed rein-
terpretation narrowing the scope of the Bevill exclusion. See 
50 Fed. Reg. 40,292 (1985). EPA then changed its mind, 
withdrew its proposed reinterpretation, and was sued again. 
In Environmental Defense Fund v. EPA, this court ordered 
the Agency to relist spent potliner by August 31, 1988. 852 
F.2d 1316, 1331 (D.C. Cir. 1988). The Agency complied, see 
53 Fed. Reg. 35,412 (1988), but missed the six-month statuto-
ry deadline for promulgating land disposal restrictions and 
treatment standards. As the result of another suit filed by 
EDF, EPA signed a consent decree requiring it to promul-
gate a final rule establishing land disposal restrictions for 
spent potliner by June 30, 1996. See EDF v. Reilly, No. 
89-0598 (D.D.C.).

 In April 1996, EPA promulgated the first of three rules 
challenged here. The Rule prohibited land disposal of spent 
potliner unless the waste satisfied the s 3004(m) treatment 
standard established in the same rulemaking. See 61 Fed. 
Reg. 15,566 (Apr. 8, 1996). The April 1996 Rule also granted 
a nine-month national capacity variance pursuant to 
s 3004(h)(2) "to allow facilities generating K088 adequate 
time to work out logistics." 61 Fed. Reg. at 15,589.

 At the time of the April 1996 rulemaking, only Reynolds 
Metals Company was engaged in full-scale treatment of spent 
potliner. Reynolds, an intervenor in this case, had begun 
treating spent potliner at its facility in Gum Springs, Arkan-
sas several years before any rule was proposed. See Brief for 
Intervenors at 4. The Reynolds treatment process involves 


crushing spent potliner to particle size and adding roughly 
equal parts limestone and brown sand.4 According to Reyn-
olds, the brown sand prevents the mixture from clogging in 
the kiln and the limestone reacts with the fluoride in spent 
potliner to transform it into relatively insoluble calcium fluor-
ide. See 56 Fed. Reg. 32,993, 33,003 (1991); see also 56 Fed. 
Reg. 55,160, 55,180 (1991) (discussing potential for slagging or 
clogging in thermal treatment of spent potliner). The mix-
ture is fed into a thermal rotary kiln that is 250 feet in length 
and 9.5 feet in diameter. Natural gas heats the kiln to 1200 
degrees Fahrenheit. When the material exits the kiln, it is 
cooled and then deposited in an on-site monofill.

 Under its "derived from" rule, EPA listed the kiln residue 
as hazardous because it was generated from the treatment of 
a hazardous waste. See 40 C.F.R. s 261.3(c)(2)(i). In August 
1989, Reynolds petitioned EPA to "delist" its kiln residue--
exempt it from the list of hazardous wastes--maintaining that 
the treated residue was no longer hazardous. EPA granted 
Reynolds' delisting petition pursuant to RCRA s 3001(f), 42 
U.S.C. s 6921(f). See 56 Fed. Reg. 67,197 (1991). The 
delisting allowed Reynolds to dispose of treated spent potlin-
er in non-Subtitle C units. EPA recognized that although it 
was not specifying a particular technology, as a practical 
matter Reynolds would wind up treating most spent potliner 
because Reynolds provided "virtually all existing treatment 
capacity." 62 Fed. Reg. at 1993.

 The April 1996 Rule for spent potliner established a treat-
ment standard expressed as numerical concentration limits 
for various constituents in the waste. The constituents in-
cluded cyanide, toxic metals, a group of organic compounds 
called polycyclic aromatic hydrocarbons (PAHs), and fluor-

__________
 4 Brown sand is an alkaline mud generated in the process of 
extracting alumina from bauxite. Reynolds had previously operat-
ed a bauxite mine and had stockpiled large quantities of brown 
sand. See 56 Fed. Reg. at 33,003.


ide.5 EPA explained that most of these limits were equiva-
lent to universal treatment standards, which it developed "by 
evaluating all existing Agency data from various technolo-
gies." 6 April 1996 Rule, 61 Fed. Reg. at 15,585; see also 40 
C.F.R. s 268.48 ("Universal Treatment Standards" Table). 
The exception was fluoride, for which the concentration limit 
was based on data submitted in Reynolds' delisting petition. 
The standards for cyanide and the organic constituents were 
based on a "total composition concentration analysis." 61 
Fed. Reg. at 15,584. For fluoride and the metals, including 
arsenic, treatment standards were expressed in terms of the 
Toxicity Characteristic Leaching Procedure or TCLP. Id.

 Because EPA's use of the TCLP is pivotal to the case, it 
will be helpful to examine the test in some depth. EPA 
developed the TCLP in response to a congressional directive 
in the 1984 Amendments to improve its then-existing toxicity 
characteristic test by making changes "necessary to insure 
that it accurately predicts the leaching potential of wastes 
which pose a threat to human health and the environment 

__________
 5 Key treatment standards for non-wastewater forms of K088 
were established as follows:

 arsenic 5.0 mg/l TCLP

 cyanide (total) 590 mg/kg

 cyanide (amenable) 30 mg/kg

 fluoride 48 mg/l TCLP

See 40 C.F.R. s 268.40, "Treatment Standards for Hazardous 
Wastes" Table. Fluoride itself is not a hazardous constituent, but 
EPA decided to regulate it because it "is capable of causing 
substantial harm in the form of groundwater degradation, adverse 
ecological effects and potential adverse human health effects. The 
Agency's view thus is that, unless fluoride in this waste is treated, 
the legal standard in section 3004(m) would not be satisfied." 61 
Fed. Reg. 15,566, 15,585 (1996).

 6 "A universal standard is a single concentration limit estab-
lished for a specific constituent regardless of the waste matrix in 
which it is present, i.e., the same treatment standard applies to a 
particular constituent in each waste code in which it is regulated." 
Proposed Best Demonstrated Available Technology (BDAT) Back-
ground Document for Spent Potliners From Primary Aluminum 
Reduction--K088 (Jan. 13, 1995).

when mismanaged." 42 U.S.C. s 6921(g). See generally 
Edison Electric Inst. v. EPA, 2 F.3d 438, 442 (D.C. Cir. 1993) 
(discussing EPA's promulgation of revised toxicity character-
istic test). The TCLP is designed to simulate the mobility or 
leachability of toxic constituents into groundwater following 
disposal of a hazardous waste in a municipal solid waste 
landfill.7 In 1990 EPA adopted the TCLP as the required 
test for measuring the mobility of toxic metals in all solid 
wastes. See 55 Fed. Reg. 11,798 (1990).

 For solid wastes, the TCLP involves reducing a sample of 
the waste to particle size and mixing it with an extraction 
fluid. One of two extraction fluids is used depending on the 
alkalinity of the waste being tested. See 51 Fed. Reg. 21,648, 
21,655-56 (1986). Any solid is then discarded and the re-
maining liquid, called the TCLP extract, is analyzed for toxic 
contaminants. A solid waste exhibits the characteristic of 
toxicity if it contains any one of a number of contaminants 
specified by EPA at a concentration equal to or greater than 
the regulatory level. See 40 C.F.R. s 261.24 & Table 1 
(Maximum Concentration of Contaminants for the Toxicity 
Characteristic). For example, the regulatory level for arsenic 
is 5.0 mg/l. A waste would be considered toxic--and thus 
hazardous--if, when measured by the TCLP, it revealed a 
concentration of arsenic equal to or greater than 5.0 mg/l. 
Use of the TCLP is widespread in EPA's regulations imple-
menting land disposal restrictions. For all wastes covered by 
waste extract standards, the TCLP is used to measure com-
pliance. See 40 C.F.R. s 268.40(b).

 Without any formal notice and comment, EPA promulgated 
the second spent potliner rule in January 1997, just as the 
first national capacity variance was due to expire. See 62 

__________
 7 Leaching is the process whereby constituents in the waste 
become suspended or dissolved in liquids, such as rainwater, that 
percolate through the waste. Leachate is a fluid containing these 
components drawn from the original waste. In some cases, solubili-
ty--the degree to which a chemical dissolves in water--depends on 
the pH of the medium. Some compounds are more soluble in 
highly alkaline conditions and others are more soluble in highly 
acidic conditions.


Fed. Reg. 1992 (Jan. 14, 1997) ("January Rule"). Entitled 
"Emergency Extension of the K088 Capacity Variance," the 
January Rule stated that "unanticipated performance prob-
lems" were causing the Agency to postpone implementing the 
land disposal prohibition for an additional six months. EPA 
explained that "notwithstanding that the wastes as tested by 
the TCLP would have complied with the land disposal restric-
tion treatment standards for the non-wastewater forms of 
K088, actual sampling data shows potentially high concentra-
tions of hazardous constituents in the leachate" from Reyn-
olds' landfill. 62 Fed. Reg. at 1993.8 The length of the 
extension was based on EPA's estimate of the time it would 
take to "modify, evaluate, and correct the current deficiencies 
in treatment performance." Id. at 1992. EPA admitted that 
it "was not aware of these data until recently, and in particu-
lar was not aware of these data during the rulemaking which 
established the K088 treatment standard." Id. at 1993 n.6.

 In July 1997, EPA announced that "Reynolds' treatment 
(albeit imperfect) does reduce the overall toxicity associated 
with the waste" and consequently was an improvement over 
the disposal of untreated spent potliner. 62 Fed. Reg. at 
37,696. Because Reynolds agreed to give up its delisting and 
manage the treated waste in a landfill subject to Subtitle C 
safeguards, the Agency decided that "protective disposal ca-
pacity exists." Id. at 37,697. It authorized a three-month 
extension of the national capacity variance to give generators 
time to make arrangements with Reynolds. Id. On October 
8, 1997, the extension ended and the prohibition on land 
disposal of untreated spent potliner took effect.

__________
 8 EPA reported the following levels in actual leachate as mea-
sured in September 1996:

 total cyanide 46.5 mg/l

 arsenic 6.55 mg/l

 fluoride 45 mg/l

Id. 


 II. JURISDICTIONAL AND PROCEDURAL ISSUES

 Before we get to the merits two issues must be resolved. 
The first is whether requests petitioners filed with EPA for 
reconsideration deprive this court of jurisdiction. The second 
is whether petitioners' challenges to the treatment standard 
are confined to the record before EPA at the time of the 
April 1996 rulemaking.

A. The Effect of Pending Requests

 Timely petitions for judicial review of the April 1996, 
January 1997, and July 1997 Rules were respectively filed on 
July 6, 1996, January 21, 1997, and September 15, 1997. See 
42 U.S.C. s 6976(a)(1) (establishing 90-day filing window). 
While these petitions for judicial review were pending, peti-
tioners submitted to EPA a "Petition for Amendment of Land 
Disposal Restrictions Phase III--Spent Potliner" on July 9, 
1996, and a "Petition for Amendment of RCRA Rule Regard-
ing Spent Potliner" on April 11, 1997.

 A party's pending request for agency reconsideration ren-
ders "the underlying action nonfinal, regardless of the order 
of filing" with respect to that party. Wade v. FCC, 986 F.2d 
1433, 1434 (D.C. Cir. 1993); see also TeleSTAR, Inc. v. FCC, 
888 F.2d 132 (D.C. Cir. 1989); United Transp. Union v. ICC, 
871 F.2d 1114 (D.C. Cir. 1989). Thus, if petitioners' filings at 
EPA sought agency reconsideration, they would operate to 
deprive this court of jurisdiction over the July 6, 1996, and 
January 21, 1997, petitions for judicial review. They would 
not affect the September 15, 1997, petition for judicial review, 
which challenged EPA's July Rule, because the filings dealt 
solely with the rules promulgated earlier.

 A request for a new rulemaking, however, would not pose 
any problem for our subject matter jurisdiction. See Ameri-
can Mining Congress v. EPA, 907 F.2d 1179, 1185 (D.C. Cir. 
1990). Once a rule is final, an agency can amend it only 
through a new rulemaking. See American Petroleum, 906 
F.2d at 739-40. In this case, EPA promulgated both a 
treatment standard, which it treated as a final rule, and a 
national capacity variance, which it extended twice. Since 


petitioners' filings with the Agency not only attacked the 
treatment standard but also requested an extension of the 
existing national capacity variance, it is hard to characterize 
them as solely requests for reconsideration, or for a new 
rulemaking. RCRA's provision governing agency petitions 
does not distinguish among requests for "promulgation, 
amendment, or repeal." 42 U.S.C. s 6974(a). We shall 
therefore assume, arguendo, that petitioners sought agency 
reconsideration.

 After the submission of briefs in this case but before oral 
argument, petitioners informed EPA that they were "hereby 
withdraw[ing] any and all such" requests then pending.9 
Attachment to Petition for Review (Dec. 17, 1997). They 
immediately filed a new petition for judicial review and a 
motion to consolidate it with the earlier petitions, which we 
granted. Petitioners' actions, although late in the day, have 
cured the jurisdictional defect. See United Transp. Union, 
871 F.2d at 1118; TeleSTAR, 888 F.2d at 134. Their new 
petition, filed on December 17, 1997, is timely with respect to 
the April 1996 and January 1997 Rules because the 90-day 
statute of limitations was tolled by the pending administrative 
requests for reconsideration. See Stone v. INS, 514 U.S. 386, 
392 (1995); ICC v. Brotherhood of Locomotive Eng'rs, 482 
U.S. 270, 284-85 (1987). Although neither Stone nor Locomo-
tive Engineers addressed the situation of a party withdrawing 
a request for reconsideration, rather than the agency taking 
final action on it, this court recently held that withdrawal had 
the same effect on the time within which to appeal. "We see 
no reason why the principles of the general tolling rule should 
not be applied when an optional administrative petition to 
reconsider is withdrawn rather than being acted upon by the 
agency." Los Angeles SMSA Ltd. Partnership v. FCC, 70 
F.3d 1358, 1359 (D.C. Cir. 1995). 

__________
 9 EPA conceded at oral argument that any jurisdictional defect 
was cured by the withdrawal of the pending petitions. It is, of 
course, this court's duty to satisfy itself of jurisdiction independent-
ly. See Bender v. Williamsport Area Sch. Dist., 475 U.S. 534, 541 
(1986).


B. Record Under Review

 The second preliminary issue relates to the record. EPA 
objects that petitioners' claims are based on information not 
available to it at the time the first spent potliner rule was 
issued in April 1996. See Brief for Respondents at 23-28. 
The Agency contends that petitioners waived their objections 
to the treatment standard because they failed to raise them 
during the original rulemaking, and that review is limited to 
the administrative record compiled at that time. According 
to EPA, it never reopened the issue of the treatment stan-
dard in the January or July 1997 rulemakings, and thus 
review of evidence discovered after the April 1996 rule is 
foreclosed. Id. at 27.

 Undoubtedly, new information calling into question the 
efficacy of the treatment standard and the Reynolds process 
prompted many of petitioners' current challenges. Petition-
ers cannot be deemed to have waived these claims by failing 
to present them in April 1996. While judicial review should 
be based on the full administrative record before an agency at 
the time of its decision, see Citizens to Preserve Overton 
Park, Inc. v. Volpe, 401 U.S. 402 (1971); Walter O. Boswell 
Memorial Hosp. v. Heckler, 749 F.2d 788, 792 (D.C. Cir. 
1984), there are at least two ways in which the record 
developed after the April 1996 Rule is properly before us. 
Although we are concerned not with the timeliness of the 
petitions--each petition for judicial review was timely with 
respect to the rule it challenged--but with the content of the 
decisionmaking record, our analysis draws on the law regard-
ing the time limits for seeking review.

 First we look to the doctrine of reopening. When "an 
agency's actions show that it has not merely republished an 
existing rule ... but has reconsidered the rule and decided to 
keep it in effect, challenges to the rule are in order." Public 
Citizen v. Nuclear Regulatory Comm'n, 901 F.2d 147, 150 
(D.C. Cir. 1990). Reopening may be explicit, or it may be 
implicit. See Kennecott Utah Copper Corp. v. United States 
Dep't of Interior, 88 F.3d 1191 (D.C. Cir. 1996); State of Ohio 
v. EPA, 838 F.2d 1325 (D.C. Cir. 1988).


 Statements made in the January 1997 Rule, which the July 
1997 Rule referred to as a "notice," 62 Fed. Reg. at 37,695, 
indicate that EPA was considering whether environmental 
performance was so dismal that the treatment standard 
should be re-written. Given the new information about the 
actual results at the Reynolds facility, it would have been 
surprising if EPA had no second thoughts. "In almost all 
cases," EPA stated in January 1997, "simply meeting the 
treatment standards" suffices for s 3004(m), but "where 
treatment is not operating so as to reduce environmental 
availability of key hazardous constituents appreciably ... the 
Agency must question the adequacy of the treatment." 62 
Fed. Reg. at 1994. EPA cautioned that its action should not 
be read "to vitiate a treatment standard whenever treatment 
performance turns out in practice to be less than predicted by 
analytic protocols such as the TCLP," id., thus implying that 
in this particular case poor performance had undermined 
EPA's confidence in its treatment standard.

 EPA's reopening of its fluoride concentration limit, which 
had been based on the data in the Reynolds' delisting peti-
tion, was more explicit. In the January Rule, EPA noted that 
it "may have to ultimately revise the treatment standard for 
fluoride.... EPA will be seeking more information to more 
fully characterize the treatment process for fluoride during 
the extended national capacity variance period." 62 Fed. 
Reg. at 1995 n.13.

 That EPA reopened the entire spent potliner treatment 
standard becomes all the more apparent when one considers 
that the question whether to extend the national capacity 
variance under s 3004(h)--which EPA insists was the sole 
focus of its January and July 1997 rulemakings--is inextrica-
bly linked with the question whether the s 3004(m) treatment 
standard worked. EPA now denies this, saying that the 
"protective" standard of s 3004(h) alone controls the determi-
nation whether there is adequate disposal capacity. Brief for 
Respondents at 38. But the Agency said something quite 
different when these matters were before it. In its July 
Rule, EPA described the issue confronting it not as one of 
"adequate volume of treatment capacity," but as "environ-


mental adequacy, specifically whether treatment satisfies the 
requirements of section 3004(m) which says that treatment is 
to be sufficient to minimize threats to human health and the 
environment posed by land disposal of the waste, and section 
3004(h)(2) which says that to be adequate treatment and 
disposal capacity must be protective of human health and the 
environment." 62 Fed. Reg. at 37,695. EPA itself an-
nounced that its "January notice" was "premised on two 
factors: 1) treatment performance that was less than predict-
ed through the use of models in the delisting proceeding and 
(for constituents whose treatment is measured by the TCLP 
protocol) the [land disposal restriction] treatment standard; 
and 2) unsafe disposal.... The two rationales are linked and 
influence one another." Responses to Major Comments for 
Waste K088 (July 7, 1997).

 Once an agency reopens an issue, whether by soliciting 
comments or indicating a willingness to reconsider, "a new 
review period is triggered." Kennecott, 88 F.3d at 1213. By 
the same token, once an agency reopens, the record before 
the agency at the time of reopening may be reviewed by the 
court. Because EPA reopened the treatment standard, the 
record developed at the time of the January and July rule-
makings is the record for the purpose of judicial review.

 The same result may be reached by a different route. 
RCRA provides that a petition for review may be filed after 
the ninetieth day if "based solely on grounds arising after 
such" date. 42 U.S.C. s 6976(a)(1). See Natural Resources 
Defense Council, Inc. v. EPA, 907 F.2d 1146, 1165 (D.C. Cir. 
1990). With respect to a similar provision in the Clean Air 
Act, we said that the provision was designed to "assure that 
standards were revised whenever necessary" on the basis of 
new information. Oljato Chapter of Navajo Tribe v. Train, 
515 F.2d 654, 660 (D.C. Cir. 1975). Oljato laid out, as a 
precondition, "presentation to the Administrator of any new 
information thought to justify revision of a standard of per-
formance." Id. at 666.


 What occurred here satisfied the Oljato standard. After 
issuing its April 1996 Rule, new data came to EPA's attention 
by the fall of 1996. EPA published the data in its January 
1997 Rule. 62 Fed. Reg. at 1993. Petitioners also submitted 
to EPA numerous comments and petitions, now withdrawn, 
discussing the implications of these developments. Although 
EPA did not formally act on petitioners' submissions, it did 
respond to comments, saying it was "considering these ques-
tions ... but not in the context of the present proceeding." 
In Group Against Smog & Pollution, Inc. v. EPA, we held 
that evidence "submitted in the form of comments ... rather 
than in a formal petition" satisfied the procedural require-
ments because the agency "appear[ed] here to have taken 
heed of petitioners' comments." 665 F.2d 1284, 1290 (D.C. 
Cir. 1981). For the purpose of our inquiry, it is important 
only that the information was presented to EPA at the time it 
decided against altering the treatment standard. Whether 
EPA's decision to stand pat represented a decision not to 
reconsider the standard is, in light of the information known 
to EPA at that time, a distinction having no bearing on our 
review of the record.

 III. MERITS

 With one exception, petitioners' objections are not well-
taken. They charge EPA with having improperly adopted 
Reynolds as the "best demonstrated available technology" 
("BDAT") instead of superior vitrification technology. See 
Brief for Petitioners at 19. Our review of the proposed spent 
potliner rule and the background documents does not bear 
this out. For everything other than fluoride, EPA did not 
base its concentration limits on Reynolds' numbers. It used 
universal treatment standards and made explicit its under-
standing that "any treatment technology (other than imper-
missible dilution) can be used to achieve those levels." April 
1996 Rule, 61 Fed. Reg. at 15,585. EPA is correct that 
petitioners have confused the treatment standard with the 


performance of the Reynolds treatment process. See Brief 
for Respondents at 28. We also find that comments submit-
ted to EPA in 1992 in response to its Advanced Notice of 
Proposed Rulemaking did not sufficiently alert the Agency to 
potential problems with the use of the TCLP for alkaline 
wastes such as spent potliner. See Comalco On-Site Engi-
neering Report.

 This brings us to petitioners' serious and substantial criti-
cism of the TCLP, a criticism based on evidence that came to 
light after the April 1996 rulemaking. It was, petitioners 
believe, arbitrary and capricious for EPA to continue using 
the TCLP to measure compliance with the treatment stan-
dard once it knew that the test was not an accurate predictor 
of the mobility of toxic constituents in the actual leachate.

 As discussed above, the concentration limits for fluoride 
and the toxic metals in spent potliner are expressed in terms 
of the TCLP. See 40 C.F.R. s 268.40. Thus the TCLP cannot 
be divorced from the standard itself. Because these constitu-
ents cannot be destroyed, the goal of treatment is to minimize 
their mobility. The treatment standard is in fact a model 
intended to predict the degree to which these constituents 
will leach following disposal. The problem, as EPA has 
admitted, is that the model does not work. The leachate 
"generated from actual disposal of the treatment residues is 
more hazardous than initially anticipated." 62 Fed. Reg. at 
37,695. When tested by the TCLP, the treated spent potliner 
exhibited numbers that were lower than the regulatory levels 
for toxic constituents, but tests of the actual leachate revealed 
numbers above the concentration limits. Arsenic, which has a 
treatment standard of 5.0 mg/l TCLP, was present in the 
leachate at 6.55 mg/l. Fluoride has a concentration limit of 48 
mg/l TCLP, but a leachate concentration of 2228 mg/l. In its 
proposal to revoke the delisting of Reynolds' treated spent 
potliner, EPA described the "residue leachate concentrations" 
as "orders of magnitude higher than the average predicted 


TCLP leachate values." 62 Fed. Reg. 41,005, 41,008-09 
(1997).

 EPA attributes the failure of the TCLP to several factors. 
It acknowledged in the January Rule that the "extreme 
alkaline pH conditions that exist in the Gum Springs monofill 
were not anticipated by the Agency and are not analogous to" 
conditions simulated by the TCLP. 62 Fed. Reg. at 1994. 
The TCLP is premised on a "generic mismanagement scenar-
io" in which hazardous waste is deposited in a municipal solid 
waste landfill, where other wastes would act as buffer agents. 
See 51 Fed. Reg. at 21,654-55; see also Edison Electric, 2 
F.3d at 445 (describing mismanagement scenario for the 
TCLP). Reynolds disposes of treated spent potliner in a 
monofill--a landfill receiving only spent potliner--where the 
high pH level remains undiluted. In the July 1997 Rule, 
EPA stated:

 In hindsight, it is now apparent that spent potliners are 
 themselves highly alkaline and contain cyanide, arsenic, 
 and fluoride--constituents which are most soluble under 
 alkaline pH.... EPA had failed to take into account the 
 effect of alkaline disposal conditions on potliners and 
 potliner treatment residues when promulgating ... the 
 treatment standard for K088 wastes....

62 Fed. Reg. at 37,695. Despite these flaws, the Agency 
concluded: "Although it is now apparent that the TCLP is 
not a good model for disposal conditions to which K088 would 
be subject, the treatment standard still requires use of the 
TCLP and any results so obtained that do not exceed the 
treatment standard are in compliance." 62 Fed. Reg. at 
37,696 n.12.

 We cannot make sense of EPA's conclusion. Why should 
the treatment standard for spent potliner be maintained when 
that standard has no correlation to the actual fate of toxic 
constituents upon disposal? Petitioners ask this question; 
EPA gives no good answer. An agency's use of a model is 


arbitrary if that model "bears no rational relationship to the 
reality it purports to represent." American Iron & Steel 
Inst. v. EPA, 115 F.3d 979, 1005 (D.C. Cir. 1997) (quotations 
and citations omitted). Models need not fit every application 
perfectly, nor need an agency "justify the model on an ad hoc 
basis for every chemical to which the model is applied." 
Chemical Mfrs. Ass'n v. EPA, 28 F.3d 1259, 1265 (D.C. Cir. 
1994). If, however, "the model is challenged, the agency 
must provide a full analytical defense." Eagle-Picher Indus., 
Inc. v. EPA, 759 F.2d 905, 921 (D.C. Cir. 1985); see also 
Natural Resources Defense Council, Inc. v. Herrington, 768 
F.2d 1355, 1385 (D.C. Cir. 1985). Furthermore, EPA "retains 
a duty to examine key assumptions as part of its affirmative 
burden of promulgating and explaining a non-arbitrary, non-
capricious rule." Small Refiner Lead Phase-Down Task 
Force v. EPA, 705 F.2d 506, 534 (D.C. Cir. 1983). Here EPA 
knows that "key assumptions" underlying the TCLP are 
wrong and yet has offered no defense of its continued reliance 
on it.

 In Edison Electric Institute v. EPA, petitioners challenged 
the application of the TCLP to mineral wastes. We held that 
the TCLP "must bear some rational relationship to mineral 
wastes in order for the Agency to justify the application of 
the toxicity test to those wastes." 2 F.3d at 446. Finding no 
evidence "that mineral wastes were exposed to conditions 
similar to those simulated by the TCLP," we ordered a 
remand "to allow the Agency to provide a fuller and more 
reasoned explanation for its decision." Id. at 447. Similarly, 
in Chemical Manufacturers Ass'n, we vacated a rule prem-
ised on a "generic air dispersion model" when applied to a 
chemical which evidence indicated was a solid, not a gas, at 
the relevant temperature. 28 F.3d at 1264. "For want of a 
rational relationship between the model and the molecule, we 
hold that the rule ... is arbitrary and capricious." Id. at 
1266.

 In this case, there is not only no evidence that treated 
spent potliner is exposed to the disposal conditions that the 


TCLP simulates, but all available evidence indicates that the 
treated residue is disposed of in quite different circumstances. 
It is impossible to say at this point whether the TCLP would 
be an inaccurate predictor for spent potliner's leachability 
following all forms of treatment. Certain aspects of the 
Reynolds treatment process--disposal in a dedicated monofill 
and the additives it uses--increase alkalinity. The TCLP 
may or may not work well for other spent potliner treatment 
technologies.

 EPA argues that it could have made a "per se finding that 
because Reynolds' process met the treatment standard it 
automatically provided protective capacity." Brief for Re-
spondents at 37. Instead it "examined the actual perfor-
mance ... and the actual disposal" and concluded that the 
Reynolds process provides "substantial treatment" because it 
destroys most of the cyanide and all of the PAHs. Id. at 37, 
40. This does not amount to a justification of the use of the 
TCLP. For a treatment standard to work, it must be reason-
ably accurate. It would be inefficient and unwise for EPA to 
assume the burden of investigating environmental data, test-
ing actual leachate, and making ad hoc safety determinations 
for each facility that treats spent potliner.

 We therefore conclude that EPA's use of the TCLP is 
arbitrary and capricious. As a result, we must vacate the 
treatment standard itself because the concentration limits for 
fluoride and the metals, including arsenic, are expressed only 
in terms of the TCLP. Our decision today does not affect the 
viability of the concentration limits established for other 
constituents. Vacating the treatment standard for spent 
potliner also requires us to vacate the prohibition on land 
disposal.10 Contrary to EPA's arguments on appeal, see Brief 
for Respondents at 50-51, we believe Congress intended 
treatment standards and land disposal restrictions to operate 
in tandem. The statutory language indicates as much. 

__________
 10 Due to EPA's interpretation of the Bevill Amendment, spent 
potliner was not listed until 1988. It thus escapes the statutory 


RCRA s 3004(m) requires that "simultaneously" with the 
promulgation of prohibitions on land disposal, the Administra-
tor of the EPA shall "promulgate regulations specifying" 
treatment standards. 42 U.S.C. s 6924(m)(1). These regula-
tions are to "become effective on the same date" as any land 
disposal prohibition. Id. s 6924(m)(2).

 Pragmatic considerations also strongly suggest that the 
treatment standard and land disposal restriction are intended 
to work together. Banning land disposal is a relatively 
simple task, one that could be accomplished by administrative 
fiat, but promulgating treatment standards is more complicat-
ed. To ensure that EPA would act promptly, Congress 
enacted an absolute deadline of May 8, 1990--the so-called 
"hard hammer"--for all hazardous wastes listed or identified 
as of the time of the 1984 Amendments. This was a powerful 
incentive for regulatory action because a ban on land disposal 
without a means of treatment would threaten the closure of 
entire industries. Under RCRA s 3004(j), generators of a 
waste prohibited from land disposal are also barred from 
storing it. See Steel Mfrs. Ass'n v. EPA, 27 F.3d 642, 647 
(D.C. Cir. 1994) (holding that interim treatment standards 
were justified where operation of hard hammer "effectively 
would have halted the country's steel production"). If we 
were to vacate the treatment standard for spent potliner 
without vacating the prohibition on land disposal, aluminum 
manufacturers might be forced to cease production.

 EPA is of course aware of such consequences. It listed 
spent potliner in 1988 but failed to meet the six-month 
statutory deadline for promulgating a land disposal prohibi-
tion. The inference is that the Agency delayed banning land 
disposal until it could develop a treatment standard.

__________
hard hammer. EPA has stated that it "believes that these previ-
ously excluded wastes are 'newly identified' for the purpose of 
determining applicability of the land disposal prohibitions." 55 Fed. 
Reg. 22,520, 22,667 (1990).


 IV. CONCLUSION

 EPA's continued reliance on the TCLP as a means of 
determining compliance with the treatment standard is arbi-
trary and capricious. Because the Agency provided no justi-
fication for requiring a test it knew to be inaccurate, the 
petitions for review are granted in this respect. The spent 
potliner treatment standard and the prohibition on land dis-
posal are vacated and remanded.

 Our decision leaves EPA without a regulation governing 
spent potliner. If EPA wishes to promulgate an interim 
treatment standard, the Agency may file a motion in this 
court to delay issuance of this mandate in order to allow it a 
reasonable time to develop such a standard.

 So ordered.