**CONSERVATION LAW FOUNDATION, et al., Plaintiffs,**

v.

**Norman Y. MINETA, et al., Defendants, and**

**Fisheries Survival Fund, Defendant–Intervenor.**

No. CIV. A. 00–1718(GK).

United States District Court, District of Columbia.

Feb. 1, 2001.

---

Eric A. Bilsky, Washington, DC, for Plaintiffs.

Geoffrey Garver, Lori Caramanian, U.S. Department of Justice, Environmental and Natural Resources Division, General Litigation Section, David Earl Frulla, Brand & Frulla, P.C., Washington, DC, for Defendants.

## MEMORANDUM OPINION

KESSLER, District Judge.

Plaintiffs Conservation Law Foundation and American Oceans Campaign bring this action against Norman Y. Mineta in his capacity as Secretary of the Department of Commerce ("Secretary"), the National Oceanic and Atmospheric Administration ("NOAA") and the National Marine Fisheries Service ("NMFS") (collectively "Federal Defendants"), alleging that they violated the National Environmental Policy Act, 42 U.S.C. § 4332, for taking certain actions relating to scallop dredging [1] in the waters off the coast of New England. Fisheries Survival Fund ("Intervenor") has intervened in this case as a Defendant.

This matter is before the Court on the Federal Defendants' Motion to Dismiss [# 8], Plaintiffs' Motion for Summary Judgment [# 23], the Federal Defendants' Motion for Summary Judgment [# 33], and Intervenor's Motion for Summary Judgment [# 35]. Upon consideration of the motions, oppositions, replies, the arguments made at the motions hearing, and the entire record herein, for the reasons

---

1. Scallop dredging is a process in which commercial fishers employ bottom-tending mobile gear weighing up to several thousand pounds to "dredge" the surface layer of the ocean floor for scallops and other sea organisms.

discussed below, the Federal Defendant's Motion to Dismiss is **denied**, Plaintiffs' Motion for Summary Judgment is **denied**, the Federal Defendants' Motion for Summary Judgment is **granted,** and the Intervenor's Motion for Summary Judgment is **granted.**

## I. Statutory Framework

### A. The Fishery Conservation and Management Act

The Fishery Conservation and Management Act ("FCMA" or the "Magnuson–Stevens Act"), enacted in 1976, 16 U.S.C. § 1801 *et seq.,* provides the statutory framework for the protection and management of the nation's marine fishery resources. FCMA establishes eight Regional Fishery Management Councils ("FMCs" or "Councils"), each of which has the authority and responsibility to govern conservation and management of the fisheries under its geographical jurisdiction. 16 U.S.C. § 1852. The Councils perform this function by developing and implementing fishery management plans ("FMPs"). After a Council develops an FMP, the National Marine and Fishery Service ("NMFS") and/or the National Ocean and Atmospheric Administration ("NOAA"), acting on behalf of the Secretary of Commerce, evaluate the plans and determine whether they comply with the FCMA, and may approve, disapprove, or partially approve them. 16 U.S.C. § 1854. The Council relevant to the instant case is the New England Fishery Management Council ("NEFMC" or "the Council").

The approval of an FMP requires several steps: first, an immediate review of the FMP, to ensure it is consistent with the FCMA; second, the publishing of the FMP in the Federal Register, followed by the commencement of a 60–day public comment period; and third, the approval, disapproval, or partial approval of the FMP within 30 days of the end of the comment period. The Secretary may refuse to adopt an FMP recommended by a Council if it violates any of the ten "National Standards" established for FMPs by the statute. 16 U.S.C. § 1853(a)(1–10).[2]

In 1996, the Mangnuson–Stevens Act was amended by the Sustainable Fisheries Act ("SFA") to, among other things, add a new provision which required Defendants to

> describe and identify essential fish habitat for the fishery based on the guidelines established by the Secretary ..., minimize to the extent practicable adverse effects on such habitat caused by fishing, and identify other actions to encourage the conservation and enhancement of such habitat.

16 U.S.C. § 1853(a)(7), *as amended by* Pub.L. 104–297, § 108(a)(3).

Once an FMP has been approved, a Council may adopt amendments to the FMP, but approval of the amendments must undergo the same review process required of FMPs (*i.e.,* notice-and-comment rulemaking). However, a Council may modify an FMP without satisfying the full review process. All amendments adopted by the NEFMC include "framework regulatory adjustment provisions" which allow the Council to "make periodic changes in certain fishing limitations (*e.g.,* size limits, DAS [days-at-sea] limits, trip limits, areas restrictions, etc.)" more quickly than the Council would be able to using the standard notice-and-comment procedures. Defs.' Opp'n to Pls.' Mot. for P.I. at 3. These non-amendment modifications

---

**2.** The ten National Standards are: (1) preventing overfishing and maintaining "optimum yield"; (2) basing conservation on the best scientific information available; (3) managing each stock of fish as an individual unit; (4) to fairly and equitably allocate fishing privileges among the states; (5) to be efficient in the utilization of fishery resources; (6) to take into account variations and contingencies in fishery resources; (7) to minimize costs and unnecessary duplication; (8) to minimize adverse economic impacts on communities; (9) to minimize bycatch and the mortality of bycatch; and (10) to promote the safety of human life at sea.

are referred to as "framework adjust-ments" ("FAs"), and they are particularly relevant to the instant case, as the mea-sures that Plaintiffs challenge were both enacted via framework adjustments.

## B. The National Environmental Pol-icy Act

The National Environmental Policy Act ("NEPA") requires all federal agencies to prepare an Environmental Impact State-ment ("EIS") whenever they propose "ma-jor Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). To determine whether an EIS must be prepared, the agency must first submit an environmental assessment ("EA"). 40 C.F.R. § 1501.3. An EA must "briefly provide sufficient evidence and analysis for determining whether to prepare an environmental im-pact statement or a finding of no signifi-cant impact [FONSI]." 40 C.F.R. § 1508.9(a). Even if the agency performs only an EA, it must still briefly discuss the need for the proposal, the alternatives, and the environmental impacts of the proposed action and the alternatives. 40 C.F.R. § 1508.9(b). If the agency determines, af-ter preparing an EA, that a full EIS is not necessary, it must prepare a Finding of No Significant Impact ("FONSI") setting forth the reasons why the action will not have a significant impact on the environ-ment. 40 C.F.R. §§ 1501.4, 1508.13.

## II. Factual Background [3]

The New England groundfish stock be-came severely depleted by the mid–1980s, although the parties disagree on the extent of that severity. As a result, in March 1994, the NEFMC adopted Amendment 5 to the Northeast Multispecies FMP (also known as the Groundfish FMP) in order to help rebuild the groundfish population. In December 1994, with several groundfish species at or near the point of collapse, Defendants issued an emergency rule which prohibited the use of bottom-tending mobile gear, including scallop dredges, in three areas designated as Closed Area I, Closed Area II, and the Nantucket Light-ship Area (collectively the "Closed Areas"). The reason for this prohibition was that dredging results in certain amounts of groundfish bycatch [4] and disrupts certain types of ocean bottom. The closures were initially to be of short duration. However, pursuant to a subsequent framework ad-justment, the closures were continued in-definitely.[5]

In 1998, NMFS adopted Amendment 7 to the Atlantic Sea Scallop FMP ("Amend-ment 7"), which was meant to eliminate overfishing and rebuild the scallop popula-tion to a level that would produce the maximum sustainable yield. To this end, Amendment 7 permitted scallop fishers to spend 120 days-at-sea ("DAS")[6] in 1999, 51 DAS in 2000, and 49 DAS in 2001. In subsequent years, the DAS would decrease even further, to a low of 34 DAS in 2004.

**3.** Pursuant to Local Rule 7.1(h), "[i]n deter-mining a motion for summary judgment, the Court may assume that facts identified by the moving party in its statement of material facts are admitted, unless such a fact is controvert-ed in the statement of genuine issues filed in opposition to the motion." The Court thus takes these facts from the parties' statements of material facts not in dispute. Further-more, since this case is a review of an admin-istrative agency's decision, the Court also re-lies on facts contained in the administrative record.

**4.** "Bycatch" occurs when a species not in-tended to be harvested by a particular fishing gear is caught.

**5.** Plaintiffs contend that the framework ad-justment made the closures "permanent," whereas Defendants maintain that the rele-vant areas were closed on a "long-term ba-sis."

**6.** The "DAS" is the number of days a year-round fishing vessel can spend in a particular area (in this case, the waters under the juris-diction of the New England Fishery Manage-ment Council) each fishing year, which ends in March of the following year.

Amendment 7 also established fishing mortality levels as a further means of rebuilding the scallop population.[7] With the objective of maintaining optimum yield,[8] the fishing mortality levels were set at .34 for 2000, .28 for 2001, and to .15 for 2004–2007. Defs.' Statement of Material Facts ¶ 8.

According to Defendants, NMFS subsequently determined that it could maintain the 1999 DAS (120) for the 2000 fishing season while achieving the mortality levels established in Amendment 7. Accordingly, it proposed a framework adjustment ("FA"), FA 12, to modify the DAS for the year 2000. FA 12 was discussed by NEFMC members during the course of two "framework meetings," on September 22, 1999 and November 17, 1999. The FA was submitted by NEFMC to NMFS on December 9, 1999. An EA/FONSI was completed and on March 1, 2000, NMFS approved it. On March 3, 2000, a final rule was published in the Federal Register.

NEFMC also determined, based primarily on information provided in the 1999 Scallop Fishery Management Plan Stock Assessment and Fishery Evaluation ("SAFE") Report, that the scallop resource had been rebuilt far more quickly than expected. Therefore, it considered reopening portions of the three Closed Areas on a limited basis, areas which at that point had been closed for over four years. The Council proposed FA 13, which, among other things, would permit dredging in portions of the Closed Areas for limited periods in 2000: Closed Area II from June 15 through August 14; Nantucket Lightship Area from August 15 to September 30; and Closed Area I from

October 1 to December 31.[9] It is undisputed that opening these areas would permit thousands of tows of scallop dredges to occur therein.

FA 13 was discussed by NEFMC members during a series of framework meetings in September 1999, November 1999 and January 2000. It was submitted by the NEFMC to NMFS on March 7, 2000. On June 15, 2000, the Council approved a revised FA 13 (after disapproving one proposed measure); an EA/FONSI was completed, and a final rule was published in the Federal Register on June 19.[10]

Plaintiffs subsequently filed a motion for a preliminary injunction, which this Court denied. *See* Memorandum–Order of August 15, 2000 ("P.I.Order").

## III. Analysis: Defendant's Motion to Dismiss

As an initial matter, Defendants argue that Plaintiffs' complaint is time-barred because it was filed outside the relevant jurisdictional period. According to Defendants, the Magnuson–Stevens Act mandates that complaints must be filed within thirty days of enactment of the rule they challenge. *See* 16 U.S.C. § 1855(f). If true, this would make Plaintiffs' complaint one day late insofar as it challenges FA 13 and over four months late insofar as it challenges FA 12. Defendants maintain that the thirty-day limitations period imposed by § 1855(f) of the Magnuson–Stevens Act is "jurisdictional and must be strictly construed," and therefore the Court lacks jurisdiction to entertain Plain-

---

7. "The fishing mortality level is a measurement of the rate of removal of fish from a population by fishing." Defs.' Statement of Material Facts ¶ 7.

8. "Optimum yield" is defined as the level of fishing "consistent with producing the maximum sustainable yield (MSY)." 16 U.S.C. § 1802(28)(C). "MSY" is in turn defined as the "largest long-term average catch or yield that can be taken from a stock or stock com-

plex under prevailing ecological and environmental conditions." 50 C.F.R. § 600.310 (c)(1)(i).

9. NMFS subsequently decided to keep Closed Area I open an additional four weeks, until January 31, 2001. *See* Defs.' Reply at 20.

10. FA 12 and FA 13 will sometimes be referred to as "the two framework adjustments."

tiffs' claims. Defs.' Mem. in Supp. of Mot. for Summ. J. ("Defs.' M.S.J.") at 15.

Defendants argue that if Plaintiffs were permitted to avoid the thirty-day time limitation imposed by § 1855(f) simply by couching their challenges in terms of NEPA, which has no time limitation, the carefully crafted restriction of that section would effectively be wiped away. They cite a number of cases, particularly *City of Rochester v. Bond*, 603 F.2d 927 (D.C.Cir. 1979), in support of the proposition that when there is a "special statutory review procedure, it is ordinarily supposed that Congress intended that procedure to be the exclusive means of obtaining judicial review in those cases to which it applies." Defs.' M.S.J. at 16 (quoting *City of Rochester*, 603 F.2d at 931, 935).

The Court concludes that *City of Rochester*, as well as the other cases on which Defendants primarily rely, are distinguishable.

First, the cases cited by Defendants specifically address the question of which federal court (district or appellate) should provide judicial review of a particular administrative challenge, not which time period should apply to such a challenge. In *City of Rochester*, for example, our Court of Appeals declared that when the Federal Aviation Act states that "[a]ny order ... issued by the [FAA] ... shall be subject to review" in the courts of appeals, a plaintiff may not bring a challenge of an FAA rule in district court simply by labeling its challenge as one brought under NEPA. The policy rationale behind *City of Rochester*, to avoid the inefficient result of "bifurcating jurisdiction ... between district court and the court of appeals," 603 F.2d at 936, has no applicability to the issue raised here of which time limitation should apply to a NEPA challenge. *City of Rochester* does not, therefore, provide this Court with guidance on how to resolve the issue at hand.

Second, in the cases cited by Defendants, the plaintiffs brought challenges under both NEPA and the substantive statute under which a particular regulation was adopted. In the present case, however, Plaintiffs bring only a NEPA challenge. Defendants are unable to point to any decision in which a court ruled that in such a context, when a party brings only a NEPA challenge, that challenge is encumbered by time constraints imposed by a substantive statute.

At least two courts, however, have expressly ruled that plaintiffs raising NEPA-only challenges may proceed pursuant to the APA, which has no time limitation, rather than pursuant to a more limited substantive statute. *See Jones v. Gordon*, 792 F.2d 821 (9th Cir.1986); *Park County Resource Council, Inc. v. United States Dep't of Agric.*, 817 F.2d 609 (10th Cir. 1987), *overruled on other grounds by Village of Los Ranchos De Albuquerque v. Marsh*, 956 F.2d 970 (10th Cir.1992). In those decisions, plaintiffs did not satisfy the time limits prescribed by the Marine Mammal Protection Act and the Mineral Lands Leasing Act, respectively. Yet the courts permitted the plaintiffs' challenges to proceed. For example, the *Park County* Court ruled that NEPA challenges are "procedural in nature," and that to permit individual statutes' time limitations to apply to NEPA challenges would be "arbitrary and inconsistent" and would severely undermine NEPA's purpose (protection of the "human environment" from federal action). 817 F.2d at 616–17. The Court finds *Park County* to be well-reasoned and persuasive in determining the correct time limitation to apply to NEPA challenges.

■ For the reasons stated above, the Court declines to apply the time limitation in § 1855(f) of the Magnuson–Stevens Act to NEPA-only challenges, such as presented in the present case. Accordingly, Plaintiffs' complaint will be considered timely, and the Court has jurisdiction to consider it. Defendant's motion to dismiss

is denied.[11]

## IV. Standard of Review: Parties' Motions for Summary Judgment

When judging whether Defendants undertook the required NEPA analysis in enacting the relevant framework adjustments in this case, the Court is bound by a highly deferential standard of review. Under the Administrative Procedure Act ("APA"), an agency's action may be set aside only if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). In making this finding, the Court "must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971). The Court may not substitute its judgment for that of the agency. *Id.* If the "agency's reasons and policy choices ... conform to 'certain minimal standards of rationality' ... the rule is reasonable and must be upheld," *Small Refiner Lead Phase–Down Task Force v. US EPA*, 705 F.2d 506, 521 (D.C.Cir.1983) (citation omitted), even though the Court itself might have made different choices. This standard presumes the validity of agency action. *Ethyl Corp. v. EPA*, 541 F.2d 1, 34 (D.C.Cir.1976) (en banc).

Courts also give a high degree of deference to agency actions based on an evaluation of complex scientific data within the agency's technical expertise. *See Baltimore Gas & Elec. Co. v. NRDC*, 462 U.S. 87, 103, 103 S.Ct. 2246, 76 L.Ed.2d 437 (1983); *NRDC v. EPA*, 824 F.2d 1211, 1216 (D.C.Cir.1987) ("[I]t is not for the judicial branch to undertake comparative evaluations of conflicting scientific evidence.") (internal citation omitted).

## V. Analysis: Parties' Motions for Summary Judgment

Plaintiffs contend that Defendants violated NEPA by failing to undertake the requisite "hard look" before increasing the scallop DAS (in FA 12), and permitting scallop dredging in the three Closed Areas on a rotational basis (in FA 13). Plaintiffs argue that for both of these framework adjustments, the accompanying EAs were inadequate and that EISs should have been prepared. Plaintiffs contend that the EAs were defective in two primary ways.[12] These two arguments will be addressed below in Sections A and B, respectively.

### A. The Reduction in DAS for the 2000 Year From 51 to 120

Plaintiffs argue that Defendants should have used 51 DAS (which was established for the 2000 fishing season by Amendment 7 to the FMP) as their baseline of NEPA analysis, rather than 120 DAS (which was the actual DAS used for the previous year's fishing season). Plaintiffs contend that since 51 DAS was intended to be the DAS in effect for 2000, this should be the status quo against which all DAS modifications should be judged; accordingly, they argue that FA 12 "more than doubled the year 2000 DAS to 120." Pls.' Mem. of Points and Auth. in Supp. of Mot. for Summ. J. ("Pls.' M.S.J.") at 5. Plaintiffs contend that such a radical increase in DAS warrants an EIS because of its potential effect on the environment.

---

11. The Court notes that Defendants have not suggested that Plaintiffs' challenge should be subject to non-statutory time limitations, such as the equitable doctrine of laches. *See, e.g., Park County*, 817 F.2d at 617. Accordingly, the Court does not have occasion to reach that issue.

12. Of course, Plaintiffs have voiced other related criticisms of the EAs during the course of this litigation, in the voluminous pleadings filed at the preliminary injunction stage and the current summary judgment stage. However, as the issues have narrowed and crystallized over time, and especially upon hearing the parties' arguments during the January 3 motions hearing, the Court understands Plaintiffs' concerns to be founded on, or substantially related to, the two arguments identified in Sections VI.A and B of this Opinion.

Defendants respond that "neither Amendment 7, nor any subsequent amendment mandated a particular DAS regime. While Amendment 7 did set future targets for DAS, ... [it] specifically contemplated that there could be changes in the projected targets based on new scientific information." Defs.' Reply Mem. in Supp. of Mot. for Summ. J. ("Defs.' Reply") at 8. Defendants contend that their decision to modify the 2000 DAS from 120 to 51 was precisely such a change, based on reliable new information about the health of the scallop resource provided by the 1999 Scallop Fishery Management Plan Stock Assessment and Fishery Evaluation ("SAFE") Report, which considered "for the first time since 1994, the effect of the closed areas on fishing mortality and rebuilding objectives." Def.'s M.S.J. at 12; Admin. R. ("A.R.") at 3177, 3239. The SAFE Report concluded that the scallop population was being rebuilt at a far greater pace than expected.[13] Defendants argue that, based on this new information, the reduction in DAS was necessary to make the DAS consistent with the optimum yield target established in Amendment 7.[14] Defs.' M.S.J. at 11–12; A.R. at 4736. Defendants also point out that the 120 DAS established for 1999 was itself a conservation measure, and that because the DAS for 2000 was also 120, FA 12 should be viewed as preserving, rather than undermining or abandoning, the conservation strategy implemented by Amendment 7.

■ Given its general obligation to defer to agency decision-making, especially the kind of highly technical and scientific information contained in the Administrative Record, the Court cannot conclude that Defendants acted arbitrarily or capriciously in using 120 DAS as their baseline for NEPA analysis. It is simply not the Court's obligation to resolve the methodological question of whether the agency should have used 120 or 51 DAS as the true "status quo" for purposes of the 2000 fishing season.[15] Nor is it the Court's institutional role to determine whether FA 12 or its accompanying EA were models of official report-writing.[16] The only issue, rather, is whether Defendants acted in an informed and rational manner, considering all the relevant factors, in decreasing the DAS for the 2000 fishing season. Upon carefully reviewing the framework adjustment and accompanying environmental assessment, the Court concludes that they did.

First, FA 12 and its accompanying EA fully acknowledged that the 2000 DAS was being modified from that which was proposed in Amendment 7, and explained the reasons for making that modification. The framework adjustment stated that 51 DAS "would achieve the fishing mortality targets in the open areas, but would cut total

---

**13.** "The SAFE Report included new biological and economic projections ... with a new biological model that forecasts biomass and yield separately in each of the five closed areas, plus the open portions of the Georges Bank and Mid–Atlantic stock areas. *The projections indicate that scallop rebuilding is ahead of the schedule anticipated by the Amendment 7 analysis.*" FA 12; A.R. at 4732 (emphasis added).

**14.** *See supra* note 8 & accompanying text.

**15.** There are numerous overlapping scientific disciplines potentially involved in making this determination, such as crustacean biology, marine invertebrate zoology, deep-sea (marine) biology, and oceanography. It is not the Court's role to second-guess agency evalua-

tions of complex scientific data within the agency's expertise. *See Baltimore Gas & Elec. Co.,* 462 U.S. at 103, 103 S.Ct. 2246.

**16.** While Plaintiffs' characterization of the environmental assessments in this case as "badly organized and confusing," Pls.' M.S.J. at 13, might be slightly overstated, the Court agrees that the EAs are far from ideal, both in terms of clarity and organization. Accordingly, the Court's refusal to declare the EAs legally deficient should not be interpreted as any wholehearted endorsement of the way in which they were drafted. On the contrary, the Court strongly recommends that Defendants draft future EAs with the aim of eliminating the deficiencies that Plaintiffs have highlighted in this case.

mortality to a fraction of the 2000 target for the resource. It would also be unnecessarily burdensome on the industry, fail to achieve the optimum yield (OY), and cause most vessels to be unprofitable." A.R. at 4736. Second, NMFS considered two alternatives to setting the DAS at 120:(1) increasing the DAS to 142 and (2) maintaining it at 51. A.R. at 4741–42. NMFS rejected the latter alternative because such a low DAS would be necessary to meet mortality rate targets only if "all areas were open to fishing," which was not the case.[17] A.R. at 4742. It also observed that such a low DAS allocation would "produce significant reductions in net benefits" to consumers and producers. A.R. at 4742, 4771. EA 12 also noted that "[k]eeping the day-at-sea allocations the same as in 1999 would also allow time for NMFS to sort out the uncertainties in the previous assessment . . . " A.R. at 4747.

It is important to place Defendants' decision to increase the 2000 DAS in its proper context. Defendants have numerous—and oftentimes competing—statutory objectives to contend with in managing the New England waters; preservation of essential fish habitat is only one of many. Defendants are charged with, among other things, fairly and equitably allocating fishing privileges among the states, rebuilding overfished species, minimizing adverse economic impacts on communities, and promoting the safety of human life at sea. See note 2, supra (listing the ten National Standards). In reducing the DAS, the Council was acting to achieve optimum yield for the scallop stock, to mitigate adverse economic impacts on the scalloping industry, and to achieve a number of other objectives it was required to take into account.

Considering the above-quoted statements from the Framework Adjustment and Environmental Assessments in totality, the Court finds that Defendants' decision to alter the DAS for the 2000 fishing season was neither uninformed nor arbitrary.[18]

## B. The Effect of the Framework Adjustments on Groundfish Foodchain and Essential Fish Habitat

Plaintiffs also maintain that Defendants did not adequately address the impact that the two framework adjustments would have on certain groundfish species and on their essential fish habitat ("EFH").[19] Plaintiffs allege that the EFH is disrupted by the increased dredging resulting from the two framework adjustments. This is perhaps the heart of Plaintiffs' argument—that while Defendants might have enacted the framework adjustments in this case to achieve optimum yield with respect to scallop production, they did not adequately take into account the effects their actions would have on the groundfish population and the environment in which they live. Plaintiffs contend that the process of dredging strips away portions of the ocean bottom—which contains "more than half of all the benthic invertebrates, and most of

17. It should be remembered that only portions of the Closed Areas were opened to fishing; large segments of the Closed Areas have remained totally protected from dredging since their closure in 1994.

18. The Court is aware that Plaintiffs are critical of Defendants' reliance on the SAFE Report data. While Plaintiffs concede that there has been some beneficial growth of the scallop stock during the five years in which the three areas were closed to dredging, they contend that the groundfish population is in just as precarious a position as ever, as confirmed by the 1999 report published by the Multispecies Monitoring Committee of the NEFMC.

Pls.' M.S.J. at 20. However, it is important to note that the goal of the DAS allocations established by Amendment 7 was to rebuild the scallop, not the groundfish, population. Accordingly, it is not surprising (nor arbitrary or capricious) that a framework adjustment to that Amendment would base DAS modifications on information about scallop regrowth, regardless of how the groundfish population might have been faring.

19. EFH is defined as "those waters and substrate necessary to fish for spawning, breeding, feeding, or growth to maturity." 16 U.S.C. § 1802(10).

the easily digestible organic matter than these invertebrates use for food"—catching groundfish in the process and damaging the groundfish foodchain, thus further hindering the regrowth of the groundfish population. Pls.' M.S.J. at 12.

Plaintiffs contend that Defendants cannot be certain, based on the scant geological evidence they had in their possession at the time of adopting the FAs, that the areas opened to dredging contain the type of sandy ocean bottom which is more resistant to the effects of dredging, and, that no matter what the composition of the ocean bottom is, dredging is still incredibly destructive to EFH and the groundfish foodchain. Accordingly, Plaintiffs contend that the net result of FA 12 and FA 13—to increase DAS and to open certain closed areas—could have a serious detrimental impact on the groundfish population, and that the EAs for FA 12 and FA 13 should have more adequately analyzed this risk. *Id.* Specifically with respect to the opening of Closed Area I, Plaintiffs maintain that Defendants' "hard look" under NEPA "consisted of exactly two sentences: one noting that the risk existed and the next stating it was acceptable." *Id.* at 15. According to Plaintiffs, this cursory analysis fails to satisfy NEPA.

Defendants fundamentally disagree with Plaintiffs' characterization of EA 13. They contend that the EA fully acknowledged the harm that scallop dredges can cause to the ocean bottom community, especially in gravelly and rocky areas. The EA noted that dredging can cause "flattening of sand ridges and removal of some epifauna and infauna." Defs.' M.S.J. at 11 (quoting A.R. at 5470). It also observed that areas "known to contain hard and complex substrates such as gravel and rock ... take relatively longer to recover from disturbance due to fishing activity [such as dredging] than do sandy areas." A.R. at 5742. For precisely this reason, Defendants contend that they purposely chose to re-open only those segments of the Closed Areas which they believed were most likely composed of sandy ocean bottom. *See* A.R. at 5742 ("The Council has proposed reopening only that portion of Closed Area II ... [which is] mostly comprised of relatively flat sand in a moderate to high energy environment that is thought to recover relatively quickly from disturbance due to fishing activity."); *id.* ("The Council has proposed opening a portion of Closed Area I ... [which] based on the information available to the Council during the development of this framework adjustment, ... appears to be comprised of predominately sandy substrate."); A.R. at 5743 ("The Council proposed opening a portion of Nantucket Lightship Closed Area," the entirety of which appears to be "primarily comprised of relatively flat and sandy or or other relatively soft bottom habitats.").[20]

Further, Defendants point out that EA 13 concluded that the net effect of the two framework adjustments would be a *decrease* in the duration of time that scallop dredges made contact with the Georges Bank ocean bottom, thus making FA 13 conservation-neutral[21] (or even possibly

---

**20.** The parties argued at length, in their briefs and at oral argument, about this issue, Defendants contending that they relied on the best scientific evidence available (primarily the Poppe study), and Plaintiffs contending that Defendants' information was inadequate and ignored a study (the Stokesbury study) which allegedly called into question Defendants' findings regarding the ocean bottom composition of some of the areas being opened. *Compare* Defs.' M.S.J. at 28–29 *and* Defs.' Reply at 12–16 *with* Pls.' M.S.J. at 28–30 *and* Pls.' Reply Mem. of Points and Auth. in Supp. of Mot. for Summ. J. at 13–15. It is simply not the Court's role to interject itself into this extremely technical scientific debate; indeed, this is precisely the type of issue in which the Court should properly defer to Defendants' expertise. *See, e.g., NRDC v. EPA,* 812 F.2d at 725. The Court cannot say that Defendants acted arbitrarily or capriciously in making the findings that they did regarding ocean bottom composition.

**21.** "Conservation neutrality" is defined in FA 13 as "no net increase in scallop mortality, i.e. the number of scallops caught, compared to [the] status quo." A.R. at 5740 n.46. As

conservation-beneficial). Defs.' M.S.J. at 32–33; A.R. at 5740. Defendants arrived at this conclusion for two reasons.

First, they determined that FA 13 would likely shift dredging away from the areas where scallops had been intensely fished to the reopened portions of the Closed Areas, where the scallops were much larger, and consequently, required less bottom dredging time to catch. Defs.' M.S.J. at 13; *see also* Amendment 7, A.R. at 582 (observing that "scallops grow rapidly during their first several years of life with a 50–80% increase in shell height and a quadrupling of meat weight between ages 3 and 5"). Second, the Framework Adjustment enacted a 10 DAS "trade-off": any vessel fishing for scallops in the re-opened areas would automatically have 10 DAS subtracted from its 120 DAS quota, even if the trip was of a shorter duration. FA 13, A.R. at 5658–59.

As a result of these two measures, FA 13 concluded, based on the best estimates available, that "there will be a 22% reduction in bottom time needed to harvest the same amount of sea scallops within the current closed areas as compared to the status quo (i.e. no access to closed areas)." A.R. at 5740. This reduction in dredging

time would likely lead to a lower "frequency and intensity of gear use," which has been documented to result in a correspondingly lesser degree of "adverse impact" to EFH. A.R. at 5741. In other words, the EA concluded, based on the available scientific evidence, that because of FA 13 the Georges Bank as a whole—including the numerous portions comprised of more complex[22] ocean bottom—would experience less dredging and less resulting damage to EFH and the groundfish population.[23]

For the reasons stated, the Court concludes that Defendants' EFH analysis satisfies NEPA. EA 13, almost nine pages in length, cited at least six scientific studies which addressed various EFH-related issues, most notably the interaction between fishing and ocean bottom habitat; in fact, the EFH portion of the EA relied heavily on a study co-authored by one of Plaintiffs' own declarants, Peter J. Auster.[24] *See* A.R. at 5739–5741 (citing to 1999 study by Auster and Langston six times, more than any other study).

The EA acknowledged the severe impact that bottom-tending fishing gear, such as scallop dredges, is likely to have on ocean bottoms of higher complexity (*i.e.*, ocean bottoms containing rock and gravel). *See,*

used in this Opinion, however, the term more generally describes the effect a framework adjustment has on the general ocean environment, including EFH.

**22.** "Complex" ocean bottoms "generally exhibit some form of structure, either in the form of the bottom type itself (e.g., rock or boulder piles) or due to some biogenic structure associated with it (e.g., sponges, bryozoans, tunicates, mussel beds, clay pipes, etc.)." A.R. at 5739 (citation omitted).

**23.** Plaintiffs argue that the Closed Areas, having been dredge-free for over five years, were "islands of partial recovery" and that Defendants' decision to reopen portions of those areas to dredging therefore warranted an EIS, even if the net effect of the framework adjustments was to decrease dredging in the Georges Bank. Pls.' M.S.J. at 10. However, Plaintiffs make this assertion without any scientific support. Further, it could be just as easily argued that the Closed Areas' immunity

from dredging made them less, rather than more, ecologically critical than areas not so protected. Finally, it must be remembered that some "[f]ishing activity, although of a limited variety, has been allowed in the Georges Bank Closed Areas all during their closure." P.I. Order at 4.

**24.** The Court is aware that Mr. Auster has filed a declaration on behalf of Plaintiffs, indicating that while his study did emphasize the particular harm dredging has on complex bottom, it concluded that dredging is destructive to sandy bottom as well. *See* Pls.' M.S.J., Ex. 1 at 5(Decl. of Peter J. Auster). Mr. Auster also stated his belief that the framework adjustments would not be "conservation-neutral." *Id.* at 6. However, as the Court has already stated, the relevant analysis under NEPA is not whether Defendants were substantively correct with respect to the decisions they made, but rather whether they adequately considered the impact those decisions would have.

*e.g.*, A.R. at 5740 ("In more complex habitats, such as rock and gravel substrates, [bottom-tending mobile fishing] gear is associated with the scraping and smoothing of gravel mounds and turning over of rocks and boulders. Epifauna present in these habitats are often removed or crushed.") (citations omitted).[25] For precisely this reason, Defendants attempted to limit dredging in the Closed Areas, insofar as they could do so based on the existing scientific literature, to areas with sandy and less complex ocean bottoms.[26]

Further, given that EA 13 projected that the two framework adjustments would be conservation-neutral and would likely result in a net decrease in dredging in the Georges Bank, *see* A.R. at 5740–41, the Court cannot say that the EFH analysis Defendants undertook in EA 12 and EA 13 was inadequate. While the EAs' discussion of EFH might be at times less than comprehensive, the Court concludes that Defendants' decision to open portions of the Closed Areas was not arbitrary or capricious in violation of NEPA.[27]

Because the Court finds the EAs and FONSIs satisfactory for NEPA purposes, it need not reach the separate issues of whether an EIS should have been prepared and whether an injunction is warranted.

## VI. Conclusion

For the reasons stated above, the Court concludes that it has jurisdiction to consider Plaintiffs' complaint. Accordingly, the Federal Defendant's Motion to Dismiss is **denied.**

The Court also concludes that neither the environmental assessments completed by Defendants for Framework Adjustments 12 and 13, nor the decision to enact those Framework Adjustments, was arbitrary, capricious or in violation of law. The Court finds that while the environmental assessments might not have been ideally drafted, Defendants have complied with the National Environmental Policy Act. Accordingly, Plaintiffs' Motion for Summary Judgment is **denied**, the Federal Defendants' Motion for Summary Judgment is **granted**, and the Intervenor's Motion for Summary Judgment is **granted**.

An appropriate Order will accompany this Opinion.

## *ORDER*

This matter is before the Court on the Federal Defendants' Motion to Dismiss [# 8], Plaintiffs' Motion for Summary Judgment [# 23], the Federal Defendants' Motion for Summary Judgment [# 33], and Intervenor's Motion for Summary Judgment [# 35]. Upon consideration of the motions, oppositions, replies, the arguments made at the motions hearing, and the entire record herein, for the reasons discussed in the accompanying Memoran-

---

**25.** EA 13 also recognized that "bottom types of higher complexity are generally believed to have higher functional value to the ecosystem than those of low complexity," primarily because those types of habitat allow juvenile scallops to more easily evade predators, thereby increasing the scallop population's survival rate. A.R. at 5739.

**26.** To the extent that Plaintiffs argue that NEPA requires Defendants to have taken additional surveys of the Closed Areas' ocean bottom composition, their reading of the statute is simply incorrect. *See, e.g., NRDC v. Hodel,* 865 F.2d 288, 294 (D.C.Cir.1988) (noting that "NEPA's requirements are essentially procedural") (internal citation and quotations omitted).

**27.** Although the Court recognizes that the action is not strictly relevant in a legal sense, Defendants have announced their intention to prepare EISs for a new amendment (Amendment 10 to the Scallop FMP) and a new framework adjustment (FA 14), which should provide Plaintiffs with precisely the relief they seek in this case, namely, a comprehensive Environmental Impact Statement. *See* Defs.' M.S.J. at 43 (citing 65 Fed.Reg. 60367, 60397). During oral argument on January 3, 2000, counsel for Defendants and for Intervenor indicated that one of the EISs was expected to be completed by April 2001 and that the other would be completed within one year.

dum Opinion, it is this 1st day of February 2001

**ORDERED**, that the Federal Defendant's Motion to Dismiss [# 8] is denied; it is further

**ORDERED**, that Plaintiffs' Motion for Summary Judgment [# 23] is denied; it is further

**ORDERED**, that the Federal Defendants' Motion for Summary Judgment [# 33] is **granted**; it is further

**ORDERED**, that the Intervenor's Motion for Summary Judgment [# 35] is **granted**; and it is further

**ORDERED**, that this case is **dismissed**.

This Order constitutes a final adjudication on the merits.