**CONSERVATION LAW
FOUNDATION, et
al., Plaintiffs,**

v.

**Donald EVANS, Secretary
of Commerce, et al.,
Defendants.**

No. 00CV1134 (GK).

United States District Court,
District of Columbia.

Dec. 28, 2001.

Russell David Duncan, Coburn & Schertler, Washington, DC, Eric A. Bilsky, Washington, DC, for Conservation Law Foundation.

Eric A. Bilsky, Washington, DC, for Center for Marine Conservation, National Audobon Society, Natural Resources Defense Council.

Samual D. Rauch, II, Lyn Jacobs, Adam D. Issenberg, U.S. Dept. of Justice, Environmental and Natural Resources Division, Washington, DC, for William Daley, Nat. Oceanic and Atmospheric Admin. National Marine Fisheries Service.

Lyn Jacobs, Adam D. Issenberg, U.S. Dept. of Justice, Environmental and Natural Resources Division, Washington, DC, for Donald Evans.

David Earl Frulla, Brand & Frulla, P.C., Washington, DC, for Associated Fisheries of Maine, Inc., City of Portland, ME, City of New Bedford, Mass., Trawlers Survival Fund.

Eldon VanCleef Greenberg, Garvey, Schubert & Barer, Washington, DC, for Northeast Seafood Coalition.

Kirsten Engel, Commonwealth of Mass., Atty. General's Office, Boston, MA, for Commonwealth of Mass.

Mark A. Randlett, Office of Atty. Gen., Augusta, ME, for State of Maine.

James L. O'Dea, O'Dea & Assoc., Washington, DC, for Paul Parker, Craig A. Pendelton, Northwest Atlantic Marine Alliance, Inc., Stonington Fisheries Alliance, Saco Bay Alliance, Cape Cod Commercial Hook Fishermen's Ass'n.

Jennifer Patterson, Office of Atty. Gen., Concord, NH, Peter C.L. Roth, State of NH, Atty. Gen., Concord, NH, for State of New Hampshire.

Gerald F. McAvoy, R.I. Dept. of Environmental Management Providence, RI, for State of Rhode Island.

## MEMORANDUM OPINION

KESSLER, District Judge.

Plaintiffs Conservation Law Foundation, Center for Marine Conservation, National Audubon Society, and Natural Resources Defense Council charge in this lawsuit that United States Secretary of Commerce Donald Evans, the National Oceanic and Atmospheric Administration, and the National Marine Fisheries Service (hereinafter "Defendants")[1] have failed to prevent overfishing and minimize bycatch[2] along the New England coast. Plaintiffs allege that by failing to carry out their statutory mandate, Defendants have violated the Magnuson–Stevens Fishery Conservation and Management Act ("Magnuson–Stevens Act"), 16 U.S.C. § 1801 *et seq.*, as amended by the Sustainable Fisheries Act ("SFA" or "the Act"), Pub.L. No. 104–297, 110 Stat. 3559 (1996), and the Administrative Procedure Act, 5 U.S.C. § 706.

Plaintiffs have filed a Motion for Summary Judgment ("Pl.Motion") [# 12]. Upon consideration of the Complaint, Plaintiffs' Motion for Summary Judgment, Defendants' Opposition, Plaintiffs' Reply, Plaintiffs' Motion for Expedited Consideration, the administrative record, applicable case law, and the entire record herein, the Court concludes that Plaintiffs' Motion must be **granted.**

## I. STATUTORY FRAMEWORK

The Magnuson–Stevens Fishery Conservation and Management Act provides the statutory framework for the protection and management of the nation's marine fishery resources. It establishes eight Regional Fishery Management Councils, each of which has the authority and responsibility to govern conservation and management of the fisheries under its geographical jurisdiction. *See* 16 U.S.C. § 1852. The regional councils perform this function by developing and implementing fishery management plans ("FMPs") and amendments thereto.[3] After a Council develops an FMP, the National Marine and Fishery Service ("NMFS") and/or the National Ocean and Atmospheric Administration ("NOAA"), acting on behalf of the Secretary of Commerce, evaluate the FMP and determine whether it complies with the Magnuson–Stevens Act, SFA, and other applicable law. The Secretary of Commerce may then approve, disapprove, or partially approve the FMP. *See* 16 U.S.C. § 1854. The FMP amendment relevant to this case is Amendment 9, developed by the New England Fishery Management Council ("New England Council").

The approval of an FMP requires several steps: (1) an initial review of the FMP, to ensure its consistency with the Magnuson–Stevens Act, SFA, and other applicable law; (2) the publishing of the FMP in the Federal Register, followed by the commencement of a 60–day public comment period; and (3) the approval, disapproval, or partial approval of the FMP within 30 days of the end of the comment period. The Secretary may not adopt an FMP recommended by a regional council if that FMP violates any of the ten "National Standards" for FMPs established by the

---

1. Plaintiffs name Defendant Evans in his official capacity as United States Secretary of Commerce. The National Oceanic and Atmospheric Administration and the National Marine Fisheries Service are agencies within the United States Department of Commerce.

2. "Bycatch is the harvest of fisheries that are not in the targeted fishery area; not the fish that a vessel is trying to catch, but the fish that is caught incidentally." *See* 142 Cong. Rec. S10810 (Sen. Ted Stevens) (daily ed. Sept. 18, 1996).

3. For the sake of brevity, this Opinion will use the term "FMP" to refer to both FMPs and FMP amendments.

Magnuson–Stevens Act, as amended by the SFA.[4] 16 U.S.C. § 1853(a)(1–10). In addition, the Secretary may propose his own management measures if such measures become necessary and the relevant council failed to propose an appropriate measure within a reasonable amount of time. *See id.* at § 1854(c)(1). After the Secretary approves an FMP, the relevant council implements it through a "framework adjustment".[5] *See* 50 C.F.R. § 648.90.

In this case, the New England Council's Multispecies Monitoring Committee ("MSMC") recommended certain management measures to achieve the conservation targets required by the FMP. *See id.* Based on the MSMC's recommendations, the New England Council then issued Framework Adjustment 33, which the Secretary may approve after an abbreviated notice-and-comment procedure. *See id.* § 648.90(b). The Secretary must reject any framework adjustment which is not consistent with the underlying FMP or applicable law. *See* 16 U.S.C. § 1854(b)(1).

■ In 1996, Congress enacted the SFA in order to prevent overfishing and rebuild the New England groundfish stock, which had become severely depleted by the mid–1980s. *See Conservation Law Foundation*

*v. Mineta*, 131 F.Supp.2d 19, 22 (D.D.C. 2001); Pl. Motion, at 3–4; Def. Opp., at 3–4. The SFA strengthened the Magnuson–Stevens Act by requiring Defendants, *inter alia*, (1) to prevent overfishing and rebuild depleted fish populations, and (2) to report, assess, and minimize bycatch. *See* 16 U.S.C. § 1802(28); *id.* § 1802(29); *id.* § 1853(a)(10), *id.* (a)(11); *id.* § 1854(e).

The SFA regulates fishing mortality rates ("F") with reference to the maximum sustainable yield ("MSY"), defined as "the largest long-term average catch or yield that can be taken from a stock or stock complex under prevailing ecological and environmental conditions." 50 C.F.R. § 600.310(c)(1)(i). The SFA prohibited all fishing at levels exceeding MSY, and required fish populations to be rebuilt to a biomass level ("B") that "allows the fishery to produce MSY on a continuing basis" ("Bmsy").[6] *A.M.L. Int'l v. Daley*, 107 F.Supp.2d 90, 94 (D.Mass.2000); *see* 16 U.S.C. § 1802(28); *id.* § 1802(29). The statute defines "overfishing" as the "rate or level of fishing mortality that jeopardizes the capacity of a fishery to produce the maximum sustainable yield on a continuing basis." *Id.* § 1802(29).

In addition, the SFA requires that all fishery management plans rebuild depleted fish populations within a period "as

---

4. The ten National Standards require Defendants to: (1) prevent overfishing and maintain "optimum yield"; (2) base conservation on the best scientific information available; (3) manage each stock of fish as an individual unit; (4) fairly and equitably allocate fishing privileges among the states; (5) be efficient in the utilization of fishery resources; (6) take into account variations and contingencies in fishery resources; (7) minimize costs and unnecessary duplication; (8) minimize adverse economic impacts on communities; (9) minimize bycatch and the mortality of bycatch; and (10) promote the safety of human life at sea. *See Conservation Law Foundation v. Mineta*, 131 F.Supp.2d at 21 n. 2 (D.D.C. 2001).

5. A framework adjustment is comprised of management measures which would achieve the fishing mortality objectives of an FMP. *See* 50 C.F.R. § 648.90.

6. The SFA "essentially says we can only catch that portion of the fish that represents interest. This is called the maximum sustainable yield. Without touching the principal fish; that being the critical population necessary to replenish the stock year after year, we will continue to have fish." 141 Cong. Rec. H10232 (daily ed. Oct. 18, 1995) (statement of Rep. Wayne Gilchrest, House Subcommittee on Fisheries Conservation, Wildlife and Oceans).

short as possible", but "not to exceed ten years." *Id.* § 1854(e)(4)(A). The SFA imposes an October 11, 1998 deadline on all regional councils to develop the necessary rules and regulations to comply with the statute. Under ordinary review and approval procedures, Defendants would have been bound to approve all such measures no later than February 1999. *See* 16 U.S.C. § 1854(a); *Conservation Law Foundation,* 131 F.Supp.2d at 22; Pl. Motion, at 4–5. Furthermore, the SFA imposes a statutory duty on Defendants to ensure that the regional councils implemented the provisions of the SFA. *See* 16 U.S.C. § 1854(c)(1).

## II. FACTUAL BACKGROUND

### A. The Endangered New England Groundfish Fishery

The New England groundfish fishery has collapsed after being overfished for the past two decades. As Senator John Kerry noted in 1996: "We have seen the collapse of the cod and haddock fisheries. It has come about principally because of overfishing and as a result of that overfishing, our fishermen have fallen on hard times[.]" 142 Cong. Rec. S10812 (daily ed. Sept. 18, 1996). Added Rep. Gerry Studds: "In New England, for example, years of overfishing have pushed groundfish landings [catch brought to shore] to an all-time low." 141 Cong. Rec. H9117 (daily ed. Sept. 18, 1995).

As of the most recent groundfish stock assessment of August 1999, 10 of 11 assessed species had biomasses lower than Bmsy, and 6 of the 11 assessed species had biomasses lower than 1/2 Bmsy. *See* Pl. Motion, at 8 (*citing* A.R. 3068). Put another way, 10 of the assessed species were overfished under the standards set forth in Amendment 9, and 6 of the assessed spe-

cies had dropped to below half that of a healthy population level. *See id.* Against this backdrop, it is beyond dispute that the New England groundfish population has been severely depleted. As Rep. Gilchrest observed: "The collapse of the New England fishery is an example of what happens when we exceed the maximum sustainable yield of a fishery. They deep fry the goose that laid the golden egg." 141 Cong. Rec. H10232 (daily ed. Oct. 18, 1995).

### B. Defendants' Failure to Comply with the SFA

It is undisputed that Defendants have not come into compliance with the SFA. When the SFA was enacted, FMP Amendment 7 regulated fishing mortality rates for the New England coast. *See* 61 Fed. Reg. 27710 (May 31, 1996); Admin. Record ("A.R.") 4438. It is undisputed that Amendment 7 did not comply with the SFA. *See* Pl. Motion, at 8; Def. Opp., at 1. Consequently, the New England Council developed FMP Amendment 9, which revised the maximum annual fishing mortality rates for twelve depleted groundfish species.[7] *See* Pl. Motion, at 9; A.R. 3876, 3870. Plaintiffs do not dispute that Amendment 9 complies with the overfishing and fishery rebuilding provisions of the SFA, although they do argue that Amendment 9 does not comply with the bycatch provisions of the SFA.

Amendment 9 took effect on November 15, 1999. *See* A.R. 834. On April 24, 2000, Defendants approved Framework Adjustment 33, which implemented the fishing mortality targets set forth in Amendment 7, not Amendment 9. *See* A.R. 3712. As noted earlier, Amendment 7 did not comply with the SFA. It is also undisputed that Framework 33 did not implement the

---

**7.** The twelve species are cod, haddock, pollock, redfish, white hake, yellowtail flounder, windowpane flounder, winter flounder, Amer- ican plaice, witch flounder, Atlantic halibut, and ocean pout. *See* A.R. 3879.

fishing targets of Amendment 9, and did not comply with the overfishing and fishery rebuilding provisions of the SFA. *See* Def. Opp., at 1; A.R. 1655–56; 65 Fed. Reg. 21659. The parties also agree that neither Amendment 9 nor Framework 33 contains any new measures to assess or minimize bycatch. Def. Opp., at 21–22; Pl. Motion, at 33, 35.

Plaintiffs allege that Defendants have violated the SFA and APA in three ways: first, Defendants failed to comply with the SFA's overfishing and fishery rebuilding provisions; second, Defendants failed to adequately report and assess bycatch; and third, Defendants failed to minimize bycatch and bycatch mortality. Plaintiffs now move for summary judgment.

## III. STANDARD OF REVIEW

■ Under the Administrative Procedure Act, an agency's action must be set aside if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). While this standard is deferential, courts "do not hear cases merely to rubber stamp agency actions. To play that role would be 'tantamount to abdicating the judiciary's responsibility under the Administrative Procedure Act.'" *NRDC v. Daley*, 209 F.3d 747, 755 (D.C.Cir.2000) (internal citation omitted).

■ "Normally, an agency rule would be arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfg. Ass'n v. State Farm Mutual Ins.*, 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983). Furthermore, an agency may not rely on mere conclusory statements to explain its decision. *See, e.g., Chemical Mfrs. Ass'n v. EPA*, 28 F.3d 1259, 1266 (D.C.Cir.1994) (unsupported and conclusory statement regarding scientific model "added nothing to the agency's defense of its thesis except perhaps the implication that it was committed to its position regardless of any facts to the contrary."); *Bangor Hydro–Electric Co. v. FERC*, 78 F.3d 659, 664 (D.C.Cir.1996); *NRDC v. Hodel*, 865 F.2d 288, 298 (D.C.Cir.1988); *Taylor v. FDIC*, 132 F.3d 753, 762 (D.C.Cir.1997).

## IV. ANALYSIS

### A. Failure to Comply with Amendment 9

■ Plaintiffs allege that Defendants violated the SFA because they have refused to implement the overfishing requirements of Amendment 9. In October 1998, the New England Council developed Amendment 9 to bring its fishery management plan into compliance with the SFA. *See* A.R. 3867, 3876.[8] Amendment 9 imposed stricter overfishing definitions by which to replenish twelve depleted groundfish species.[9] After approval by the Secretary of

---

8. "The purpose of this amendment is to: Bring the Multispecies FMP into compliance with the new and revised national standards and other required provisions of the Magnuson–Stevens Act[.]" A.R. 3876.

9. Amendment 9 based its targets on two scientific criteria: (1) the biomass at maximum sustainable yield ("Bmsy") and (2) the fishing mortality rate at maximum sustainable yield ("Fmsy"). For a given species, Bmsy repre-

sents the biomass level required to yield MSY; Fmsy represents the fishing mortality rate required to produce Bmsy. *See* A.R. 3876.

Under Amendment 9, a fish stock has been "overfished" when its biomass level (B) is less than "that which can produce maximum sustainable yield (Bmsy) on a continuing basis." A.R. 3876. However, the SFA made clear that the fishing mortality rate may be set *lower* than Fmsy, if required by economic,

Commerce, Amendment 9 took effect on November 15, 1999.

Defendants freely concede that they have not come into compliance with the overfishing and rebuilding provisions of the SFA. *See* Def. Opp., at 1, 14. Defendants claim that they cannot implement Amendment 9 because it suffers from technical and policy deficiencies. Defendants predict that these deficiencies will be remedied in a new amendment which they do not expect to be completed until August 2003, at the earliest. *See* Parties' Conference Call with the Court (Nov. 30, 2001). In the interim, Defendants claim that Framework 33 will adequately protect the New England groundfish fishery. For the reasons discussed below, the Court rejects Defendants' argument.

■ Defendants may not approve any FMP that is inconsistent with the Magnuson–Stevens Act, as amended by the SFA. *See* 16 U.S.C. § 1853(a)(10). Furthermore, it is well established that government agencies are bound by their own regulations, including their FMPs. *See NRDC,* 209 F.3d at 753; *see also Ortiz v. Secretary of Defense,* 41 F.3d 738, 741–43 (D.C.Cir.1994); *Torrington Co. v. United States,* 82 F.3d 1039, 1049 (Fed.Cir.1996).

Despite approval of Amendment 9 on October 15, 1999,[10] with an effective date of November 15, 1999, *see* A.R. 834, the New England Council had decided, as early as September 2, 1999, not to implement Amendment 9. *See* A.R. 598. The record shows two reasons for its decision. First, the New England Council did not want to conduct the comprehensive environmental impact statement mandated by law.[11] *See id.;* A.R. 1655–56. Second, the New England Council claimed that Amendment 9 was deficient from a technical and policy standpoint. In addition, Defendants now argue that Amendment 9 failed to comply with the SFA: "Amendment 9 did *not* analyze the considerations of the remaining nine National Standards *as required by the MSA* [Magnuson–Stevens Act]." Def. Opp., at 13 n. 11 (emphasis added).

■ Since Defendants approved Amendment 9 after the statutory notice-and-comment period, they are presumed to have concluded that it complied both with the SFA and all relevant policy considerations. The Department of Commerce has a statutory responsibility to implement Amendment 9, and must now ensure that the New England Council gives it full effect.[12] *See NRDC,* 209 F.3d at 753.

■ Alternatively, Defendants argue that Plaintiffs are not entitled to any relief, because Defendants plan to remedy their non-compliance with the SFA. Defendants claim that by August 2003, they will seek

---

social, or ecological reasons. *See* 16 U.S.C. § 1802(28)(B). This lower fishing mortality rate produces the "optimum yield". *See id.* For stocks at Bmsy or above, the fishing mortality rate may not exceed the fishing mortality rate which produces the maximum sustainable yield (Fmsy). *See id.* For stocks below Bmsy, the fishing mortality rate will be lower than Fmsy so that the stock may rebuild within a specified time frame, typically five or ten years. *See* A.R. 3876–77.

10. The Secretary disapproved two measures proposed in Amendment 9 on April 7, 1999. *See* A.R. 834; Def. Response to Pl. Statement of Material Facts ¶ 16.

11. When asked why the New England Council had decided not to implement Amendment 9, the Chair responded: "Because in order to do so we need to have an Environmental Impact Statement—[Amendment 9 is] a full amendment, because the measures that we would be taking would be much more restrictive than the standards by which we've been managing the fishery." A.R. 1655–56.

12. Of course, if Defendants seek to amend Amendment 9, they may do so under the statutory rule-making process, provided that the new amendment complies with the SFA.

to implement a forthcoming Amendment 13, which will purportedly comply with the SFA. *See* Def. Opp., at 1; Parties' Conference Call with the Court (Nov. 30, 2001). In the meantime, Defendants claim that an interim measure, Framework 33, will adequately protect the threatened fish species. *See* Def. Opp., at 1.

▮ At the outset, Defendants carry a " 'heavy burden of persua[ding]' the court" that their admitted non-compliance with the SFA "cannot reasonably be expected to start up again". *Friends of the Earth v. Laidlaw Envt'l Services*, 528 U.S. 167, 189, 120 S.Ct. 693, 145 L.Ed.2d 610 (2000) (internal citation omitted). The record shows that the New England Council initially refused to implement Amendment 9, in part because it did not want to conduct a mandatory environmental impact statement. Furthermore, Defendants had a statutory duty to come into compliance with the SFA by February 1999. It is now almost three years later, and Defendants have yet to comply with the statute.[13]

In addition, Framework 33 fails to comply with the rebuilding requirements of the SFA, and thus does not render moot Plaintiffs' lawsuit. Although it was enacted after the SFA took effect, Framework 33 did not implement Amendment 9's more stringent fishing restrictions.[14] As a result, Framework 33 in many cases allows a *higher* level of fishing than the SFA permits.[15] *See* Pl. Reply, at 3, 28.

▮ To comply with the SFA as a matter of law, Defendants must show that there is at least a 50 percent probability that Framework 33 can meet the targets set by the SFA and the relevant FMP. *See NRDC*, 209 F.3d at 754. The New England Council MSMC examined whether Framework 33 could achieve SFA's rebuilding goals for five of the twelve species protected by Amendment 9, and concluded that only *one* of the species surveyed could be rebuilt within ten years. *See* A.R. 1223–35 (¶ B2 for each species). For the remaining four species, the rebuilding probabilities ranged from 1 percent to 29 percent, far below the statutory minimum. *See id.* Since Framework 33 does not adequately protect at least four of the twelve species, it too fails to comply with the SFA as a matter of law.

Given their record of inaction and delay, Defendants have not carried their burden of showing that they will remedy their ongoing violations of the SFA. *See Friends of the Earth*, 528 U.S. at 189, 120 S.Ct. 693. In refusing to implement Amendment 9, Defendants arbitrarily and capriciously short-circuited their rule-making process, and thereby violated both the SFA and APA. Accordingly, Plaintiffs may still seek a remedy for Defendants' violations of the SFA, for their cause of action is not moot.

▮ Finally, Defendants argue that technical deficiencies prevented them from implementing Amendment 9. According to

---

**13.** In its Opposition, Defendants had indicated to the Court that Amendment 13 would be implemented by Fall 2002. *See* Def. Opp., Attach. B. However, on November 30, 2001, Defendants advised the Court that their timetable had fallen yet another year behind schedule. *See* Parties' Conference Call with the Court (Nov. 30, 2001).

**14.** In fact, the Framework 33 Notice of Final Rule did not even refer to Amendment 9. *See* A.R. 3711.

**15.** For example, Amendment 9 would permit a fishing mortality rate of 0.093 and an annual target catch of 1,347 metric tons for George Bank cod. *See* A.R. 1224 ¶ B4. In contrast, Framework 33 permitted a fishing mortality rate of 0.18 and an annual target catch of 4,145 metric tons—nearly triple the amount permitted under Amendment 9. *See* A.R. 1223 ¶ B2, 3712. In other words, Framework 33 currently allows Georges Bank cod to be significantly overfished, in clear violation of the SFA.

Defendants, they could not calculate the fishing mortality rates and annual catch levels under Amendment 9, because it did not include the appropriate "control rule".[16] For the reasons discussed below, the Court rejects Defendants' argument.

As a starting point, the parties agree that Amendment 9 requires Defendants to adopt one of two possible control rules for fishing mortality rates: "F control rule" or "F msmc".[17] See A.R. 1218; Pl. Reply, at 5. Defendants assert, and Plaintiffs do not dispute, that "F msmc" is the more appropriate control rule. See Def. Opp., at 13–14; Pl. Reply, at 6.

Defendants contend that they cannot implement Amendment 9 because it did not provide fishing mortality rates under the "F msmc" control rule. See Def. Opp., at 13–14. Yet the record shows that Defendants could have calculated fishing mortality rates for all 12 fish species under the "F msmc" control rules, but simply chose not to do so. See A.R. 598. In fact, the New England Council expressly instructed its MSMC not to develop management measures, including the "F msmc" control rules, that would implement Amendment 9. See id.[18] Since Defendants themselves

had approved Amendment 9 without the "F msmc" control rule, they cannot now attack it and refuse to implement it for lacking "F msmc".

Significantly, Amendment 9 does include fishing mortality rates under the "F control rule". Thus, it is clear that Defendants can give immediate effect to Amendment 9 by adopting the fishing mortality rates under the "F control rule".[19] In any event, Defendants can, and must, give effect to Amendment 9, whether by adopting "F msmc" or "F control rule".[20] See NRDC, 209 F.3d at 753. To reprise, Defendants could and should have implemented Amendment 9 by the SFA's February 1999 deadline, but simply chose not to do so. Accordingly, Defendants have violated the SFA and APA by refusing to adopt an appropriate framework adjustment to implement Amendment 9.

## B. Bycatch Provisions of the SFA

In Claims II and III, Plaintiffs allege that Defendants violated the SFA and APA because Framework 33 and Amendment 9 failed to adequately report, assess, and minimize bycatch. Bycatch refers to fish caught incidentally while a fisher is

16. A control rule refers to "a mathematical function that expresses the relationship between biomass and allowable fishing mortality." Def. Opp., at 12 (citing A.R. 1459). For instance, Amendment 9 requires Georges Bank cod to be rebuilt in 5 years. See A.R. 1223 ¶ B1, 3879–80, 1224 ¶ B4. Using the "F msmc" control rule, the New England Council's MSMC calculated that the appropriate fishing mortality rate should be 0.093, and that the annual target catch should be 1,347 metric tons. See A.R. 1224 ¶ B4.

17. "F msmc", which is calculated by the New England Council MSMC, takes into account the "current condition" of a given fishery, including how a fishing mortality rate for one species affects the marine ecosystem as a whole. See Pl. Reply, at 5; Def. Opp., at 13 n. 11. In contrast, "F control rule" does not take into account the current condition of a

fishery; it is calculated based on certain theoretical assumptions, rather than existing conditions. See A.R. 3048.

18. "The Multispecies Monitoring Committee [MSMC] recommendations for management measures should be based on achieving the Amendment 7 objectives, with appropriate discussion and comment on how these measures relate to the Amendment 9 control rule objectives." A.R. 598.

19. If Defendants insist that it is preferable to use "F msmc", they must calculate, and adopt, fishing mortality rates under "F msmc" as soon as practicable.

20. The Court need not decide whether "F msmc" or "F control rule" is the more appropriate control rule.

trying to catch fish of a different species. *See* 142 Cong. Rec. S10810 (daily ed. Sept. 18, 1996).[21] In simple terms, bycatch kills[22] fish that would otherwise contribute toward the well-being of the fishery or the nation's seafood consumption needs.

In enacting the SFA, Congress severely criticized the present level of bycatch as unacceptably high.[23] Defendants themselves recognize the threat posed by bycatch: "[B]ycatch can increase substantially the uncertainty concerning total fishing-related mortality", and thus complicates efforts to achieve the SFA's goals to protect and rebuild threatened fish species. 50 C.F.R. § 600.350(b).

■■■■■ As an initial matter, Defendants argue that Claims II and III are time-barred, for Plaintiffs failed to challenge Amendment 9 within 30 days after it took effect. *See* § 16 U.S.C. § 1855(b) (Magnuson–Stevens Act's 30–day requirement for challenges). However, it is well established in this Circuit that a party against whom a rule is applied may bring a substantive challenge to a rule at the time of its application. *See, e.g., Independent Community Bankers of America v. Board of Governors of the Federal Reserve System,* 195 F.3d 28, 34 (D.C.Cir.1999). In this case, Plaintiffs bring a substantive, not procedural, challenge to Amendment 9; consequently, their challenge is not time-barred. *See id.* at 34.

### 1. Duty to Report and Assess Bycatch

■■■■ Claim II alleges that Defendants failed to adequately report and assess bycatch in the New England fisheries, thereby violating the SFA and APA. Under the SFA, all fishing management plans must, by October 11, 1998, "establish a standardized reporting methodology to assess the amount and type of bycatch occurring in the fishery". 16 U.S.C. § 1853(a)(11); Pub.L. 104–297 § 108(b). For this reason, Plaintiffs allege that Framework 33 and Amendment 9 violated the SFA and APA because they have not established this "standardized bycatch reporting methodology." Compl. ¶¶ 97, 100.

According to Defendants, the SFA requires them to take the following steps to establish this "standardized bycatch reporting methodology":

> A *review and, where necessary, improvement* of data collection methods, data sources, and applications of data *must* be initiated for *each* fishery to determine the amount, type, disposition, and other characteristics of bycatch and bycatch mortality in each fishery for purposes of this standard [National Standard 9, 16 U.S.C. § 1851(a)(9) ] and of sections 303(a)(11) and (12) [*id.* §§ 1851(a)(11) & (12) ].

50 C.F.R. § 600.350(d)(1) (emphasis added). Thus, under their own SFA regulations, Defendants must review and, if nec-

---

**21.** *See also* Magnuson–Stevens Act, 16 U.S.C. § 1802(2) (bycatch defined as "fish which are harvested in a fishery, but which are not sold or kept for personal use, and includes economic discards and regulatory discards.").

**22.** "With groundfish, a caught fish is a dead fish and we all know it." A.R. 230 (comments of Coastal Conservation Association).

**23.** The United Nations estimates that approximately 27 million tons of fish—about a third of world harvests—are discarded as bycatch.

*See* 142 Cong. Rec. S10819 (daily ed. Sept. 18, 1996) (statement of Sen. Fritz Hollings). According to its principal sponsor, the SFA was intended to "bring a stop to this inexcusable amount of waste". 142 Cong. Rec. S10810 (daily ed. Sept. 18, 1996) (Sen. Ted Stevens). The SFA's House sponsor noted that "[t]he reduction of bycatch in our fisheries is one of the most crucial challenges facing fishery managers today." 141 Cong. Rec. H9116 (daily ed. Sept. 18, 1995) (Rep. Don Young).

essary, improve "data collection methods" for every fishery, including the New England groundfish fishery. *Id.*

██ Defendants claim that they have already employed three measures to establish a standardized bycatch reporting methodology for the FMPs.[24] *See* Def. Opp., at 21. However, the record fails to show that Defendants have "review[ed]" the New England groundfish fishery to ensure that their management measures comply with the SFA's bycatch reporting requirements. *See* 50 C.F.R. § 600.350(d)(1). Consequently, Defendants have failed even to comply with their own SFA regulations. What is more, Defendants concede that their anti-bycatch measures suffer from significant deficiencies.[25]

Although their own MSMC and various commentators have pointed out the deficiencies of the present bycatch reporting measures,[26] Defendants have refused to adopt any new bycatch reporting measures such as a dedicated observer program. *See* A.R. 1215. Instead, they summarily labeled such measures as "impracticable and unnecessary", without proffering any deliberation or analysis from the record to justify their decision. A.R. 835 (Oct. 15, 1999).[27] Such a conclusory statement does not constitute the "review" or "improvement" of bycatch data collection methods that Defendants' own regulations require, *see* 50 C.F.R. § 600.350(d)(1), and may not be relied on to justify their decision. *See Chemical Mfrs. Ass'n*, 28 F.3d at 1266.

Finally, by keeping intact the status quo, Defendants refuse to give effect to the clear will of Congress, which expressly directed Defendants to more accurately measure and reduce bycatch. *See* 16 U.S.C. § 1853(a)(11). Therefore, the Court concludes that Defendants acted arbitrarily, capriciously, and contrary to law when it refused to adopt new measures to report and assess bycatch, and have violated the SFA and APA.

## 2. Failure to Minimize Bycatch and Bycatch Mortality

██ Finally, Claim III alleges that because Amendment 9 and Framework 33 failed to minimize bycatch and mortality arising from bycatch, they are in violation of the SFA and APA. Under the SFA, Defendants must ensure that all fishing management plans "include conservation and management measures that, to the

---

24. First, commercial fishers must record all regulatory discards in Vessel Trip Reports (VTRs), or logbooks. *See* Def. Opp., at 21. Second, Defendants supplement VTR data with bycatch data collected from a limited observer program. *See id.* (*citing* A.R. 3055). Third, Defendants participate in the Atlantic Coastal Cooperative Statistics Program, a project that purportedly will collect various fisheries data, including bycatch. *See* Def. Opp., at 23.

25. The New England Council MSMC concluded that the data from both VTRs and the limited observer program are insufficient to estimate annual bycatch levels, because commercial fishers unlawfully underreport bycatch in VTRs. *See, e.g.,* A.R. 1215 ("The [1998 cod fishery VTR] discard rates are unreasonably low and are likely to reflect non-compliance with the requirements to report discards in the VTR") (MSMC report); Pl. Motion, Exh. 5; A.R. 1751, 621, 2308, 2159–60, 4392, 835.

Finally, although nearly three years have passed since the February 1999 deadline, the Atlantic Coastal Cooperative Statistics Program has yet to be implemented and has yet to collect any bycatch-related data. *See* Def. Opp., at 23.

26. *See* note 24 *supra.*

27. In a footnote, Defendants claim that they "considered as part of the Framework 33 process the possibility of observer coverage." Def. Opp., at 24 n. 17 (*citing* A.R. 2653). Defendants proffer no reason as to *why*, as a policy matter, they refused to institute a dedicated observer program. *See id.*

extent practicable and in the following priority—(A) minimize bycatch; and (B) minimize the mortality of bycatch which cannot be avoided". 16 U.S.C. § 1853(a)(11).

It is undisputed that after the SFA was enacted, Defendants did not adopt any new measures to minimize bycatch and bycatch mortality. Rather, Defendants claim that three pre-existing measures already comply with the SFA's anti-bycatch requirements.[28] Significantly, there is no record evidence to show that Defendants considered whether their anti-bycatch measures specifically complied with the SFA; Defendants did not evaluate whether either Amendment 9 or Framework 33 minimized bycatch and bycatch mortality "to the extent practicable".[29] *See* 16 U.S.C.

§ 1853(a)(11). Thus, Defendants failed to determine whether Amendment 9 complied with the SFA, and whether they needed to adopt new anti-bycatch measures to come into compliance with the statute. Defendants "entirely failed to consider an important aspect of the problem", and thereby violated the APA and SFA. *See Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43, 103 S.Ct. 2856.

Similarly, Defendants failed to consider two other significant issues linked to bycatch. At the request of the New England Council Chair, the Council's Executive Director drafted a report detailing "problems/issues" with the groundfish FMP. *See* A.R. 600–02. With respect to bycatch, the report identified trip limits (i.e., limits on the amount of catch brought into shore to sell)[30] and fishing gear selectivity[31] as the

28. First, Defendants can suspend commercial fishing in a fishery in order to reduce bycatch. For example, Defendants closed certain areas of the Gulf of Maine cod fishery because the species' biomass had fallen to "record low levels". A.R. 3713; *see* Def. Opp., at 20. Such closures reduce bycatch and bycatch mortality, for where there is no fishing, no fish can be incidentally caught. Yet the decision to suspend commercial fishing for Gulf of Maine cod fishing came not in response to the requirements of the SFA, but in response to the "extremely dire condition" of Gulf of Maine cod. A.R. 3713. Moreover, Defendants' closure reduced bycatch for only one species. The SFA requires that an FMP include measures to address the bycatch problem to the extent practicable for the *entire* FMP, not just a single species within the FMP. *See* 16 U.S.C. § 1851(a)(9); *id.* § 1853(a)(11); 50 C.F.R. 600.350(d).

Second, Framework 33 raised trip limits for certain stocks in order to reduce regulatory discards. *See* A.R. 3055, 835. With higher trip limits, fishers have less incentive to discard fish. However, as Plaintiffs correctly note, such an approach, if implemented alone, simply "legislate[s] bycatch away by allowing fish to be landed instead of discarded." Pl. Reply, at 22.

Third, Defendants have imposed some regulations on the size and type of fishing gear used, as well as the size of fish harvested. *See* Def. Opp., at 23. However, such measures

pre-dated the SFA's more stringent requirements to minimize bycatch and bycatch mortality. *See* Pl. Reply, at 22.

29. The Court need not reach the substantive merits of these measures.

30. The Council report noted that reduced trip limits, which aim to conserve groundfish stock, actually worsen the problem of fishing mortality: "When used as a primary mortality reduction tool (as they have been), they often result in significant discards and do not reduce fishing mortality as intended." A.R. 601. In a practice known as "highgrading", fishers meet trip limits by unlawfully discarding less valuable fish and retaining the more valuable fish. *See* Pl. Motion, at 16 & Exh. 4, at 21–23. What is more, the report noted that trip limits for a single species often cause fishers to discard excess quantities of the given species as the fishers "continue to fish for other multispecies." A.R. 602; *see also* A.R. 2308.

31. The Council report concedes that the "Multispecies FMP does not provide incentives for fishermen to use more selective, less destructive fishing gear (except for large-mesh exemptions)." A.R. 602. Unselective fishing gear, such as the bottom trawls primarily employed in the groundfish fishery, constitute the chief cause of bycatch. *See, e.g.,* 142 Cong. Rec. H11443 (daily ed. Sept.

two principal areas of concern. *See* A.R. 600–02; Pl. Motion., at 20, 16

At the outset, it should be noted that the administrative record reveals no subsequent deliberation concerning either issue. Defendants rejected the New England Council MSMC's recommendations to institute a dedicated observer program and to require less destructive fishing gear for the groundfish fishery; however, the record contains no rationale for this decision.

In short, the record shows that, after the SFA was enacted, Defendants adopted no new measures to minimize bycatch and bycatch mortality in the groundfish fishery. Such an approach both ignores and frustrates the will of Congress. When it enacted the SFA, Congress made clear that it sought to "bring to a stop this inexcusable amount of waste." 142 Cong. Rec. S10810 (daily ed. Sept. 18, 1996) (Sen. Ted Stevens). Had Congress been content with the status quo, it would not have included the bycatch provisions in the SFA. Defendants' failure to minimize bycatch and bycatch mortality is arbitrary, capricious, and contrary to law, and in violation of the SFA and APA.

## V. CONCLUSION

Plaintiffs have shown that Defendants have not complied with the SFA. Specifically, Framework 33 violates the overfishing, rebuilding, and bycatch provisions of the SFA, while Amendment 9 violates the bycatch provisions of the SFA. Accordingly, Plaintiffs have shown that they are entitled to judgment as a matter of law, and their Motion for Summary Judgment must be **granted.**

An appropriate Order will issue with this Opinion.

27, 1996) ("[W]e were catching and throwing away 10 fish for every targeted fish we were keeping.") (Rep. Wayne Gilchrest). The

## *ORDER*

Plaintiffs Conservation Law Foundation, Center for Marine Conservation, National Audubon Society, and Natural Resources Defense Council have filed a Motion for Summary Judgment [# 12]. Upon consideration of the Complaint, Plaintiffs' Motion for Summary Judgment, Defendants' Opposition, Plaintiffs' Reply, Plaintiffs' Motion for Expedited Consideration, the administrative record, applicable case law, and the entire record herein, it is hereby

**ORDERED,** that Plaintiffs' Motion for Summary Judgment is granted; it is further

**ORDERED,** that the Parties appear before the Court on January 25, 2002 at 10 a.m. for a status conference to discuss appropriate remedies; and it is finally

**ORDERED,** that the Parties shall submit, five days before the status conference, a statement of how they wish to proceed.

Council report adds that there is "[n]o mechanism in the plan for increasing accountability for discarded bycatch." A.R. 602.